# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

Civil Action No.:  1:23-96

| | | |
|---|---|---|
| USA FARM LABOR, INC., JCP FARMS, LLC, LAZY BS BAR, INC., B&B AGRI SALES, LLC, HOGGARD FARMS, MASCHING AGRICULTURE, LLC, HUTTO GRAIN, KD FARM & RANCH, CIRCLE D FARMS, TRIPLE T FARMS, INC., BEBB FARMS, JAMERSON FARMS, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| JULIE SU, Acting Secretary of Labor, U.S. Department of Labor, BRENT PARTON, Acting Assistant Secretary of Labor Employment and Training Administration, U.S. Department of Labor, BRIAN PASTERNAK, Administrator, Office of Foreign Labor Certification, U.S. Department of Labor, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## I.    INTRODUCTION

1.      The United States depends on approximately two million farms located in rural communities from coast to coast to produce the nation's food supply and contribute to the economy through agricultural exports.  Although they are essential to the American food supply, these farms face numerous challenges in bringing food to the table.  The most

difficult of these challenges is the chronic shortage of agricultural labor available in the United States. Unscrupulous farms meet their needs by hiring unauthorized workers, but law-abiding farms address the labor shortage by hiring workers from overseas through the H-2A agricultural worker visa program.

2. An H-2A visa may be issued if the Secretary of Labor certifies that there are no domestic workers available and "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States **similarly employed**." 8 U.S.C. § 1188(a)(1)(B) (emphasis added).

3. The Department of Labor ("DOL" or "Department") protects the wages of similarly employed agricultural workers through the Adverse Effect Wage Rate ("AEWR"), a minimum wage that employers using the H-2A program must pay to both U.S. farmworkers and foreign guestworkers.[1] Since 1953 (with a brief exception from 2009 to 2010), DOL has set the AEWR based on a survey of farmworker wages by the U.S. Department of Agriculture, now called the Farm Labor Survey. The Farm Labor Survey is the gold standard because it is "the *only comprehensive survey* of wages paid by farmers and ranchers."[2] By using a wage survey specific to the agricultural industry, DOL has prevented the wages of U.S. farmworkers from becoming artificially depressed by competition from foreign workers willing to work for less. But DOL now proposes to abandon its 70-year-old policy of using agricultural wage surveys to set agricultural wages.

---

[1] Exhibit 1 contains a summary of acronyms used in this complaint.

[2] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70,445, 70,467 (Nov. 5, 2020) (emphasis added); *see also id*. at 70,468 ("[T]he FLS has been the only comprehensive survey of wages paid by farmers and ranchers that has enabled the Department to establish hourly rates of pay for H–2A opportunities.").

2

4.      On February 28, 2023, the Department published a Final Rule announcing changes to its methodology for setting AEWRs ("Final Rule").[3]  Starting March 30, 2023, DOL will calculate the AEWR for six occupations based on the Farm Labor Survey.  For every other occupation, DOL will instead look to a non-agricultural labor market survey called the Occupational Employment and Wage Statistics ("OEWS") survey performed by the Bureau of Labor Statistics, even though it does not represent agricultural wages.  Moreover, DOL stated that if a farmworker performs even a single job task outside of the six protected agricultural occupations, DOL would use the non-agricultural OEWS wage data to set the wage.   The Final Rule severs the link between agricultural wages and surveys of wages paid to actual farmworkers.

5.      DOL's new AEWR methodology will cause thousands of farms to suffer grievous and irreparable losses through no fault of their own. Although DOL disclaimed any knowledge that its new AEWR methodology would cause wages to increase and claimed to have no data to even assess the question, DOL officials have declared, under penalty of perjury, that wages for just one agricultural occupation (first-line supervisors of agricultural workers), will increase anywhere from 85.6% to 147.7% or, on average, 122.6% almost overnight.  Sixty-four percent of farmers surveyed said they would no longer use the H-2A program if the final rule takes effect, threatening their very existence and endangering the American food supply.

---

[3] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12,760 (Feb. 28, 2023).

6.     The Final Rule is unlawful and must be set aside under the Administrative Procedure Act ("APA").

7.     First, the Final Rule violates DOL's statutory mandate to protect the wages of "similarly employed" agricultural workers. The Final Rule turns this mandate on its head by protecting the wages of non-agricultural workers. DOL's statutory mandate reflects Congress's desire to ensure an adequate labor supply for farmers while protecting similarly employed agricultural workers from having their wages undercut by H-2A workers. The Final Rule upends the legislative compromise at the heart of the H-2A program.

8.     Second, the Final Rule is not a product of reasoned decision-making. When an agency changes a previous regulatory position, it must acknowledge that it is doing so and justify the new position. In 2010, DOL rejected use of OEWS data as a basis for making inferences about agricultural labor markets because it was "not representative of the farm labor supply" and "does not provide an appropriately representative sample for the labor engaged by H-2A employers."[4] Yet DOL now has chosen to use the same survey it previously rejected as not representative of agricultural wages, while neither acknowledging nor justifying the reversal.

9.     Further, the Final Rule does not promulgate a single, consistent rule. Rather, it offers three 'rules' – with each being modified in response to comments so much so that no one can say exactly what the 'rule' means in reality. The Final Rule says the assigned

---

[4] *Temporary Agricultural Employment of H-2A Aliens in the United States*, 74 Fed. Reg. 45,906, 45,912 (Sept. 4, 2009).

4856-6940-6806 v.1

AEWR will depend on the occupation it chooses for the employer. DOL says that 98% of occupations will stay the same (Final Rule at 12,755), unless they change (Final Rule at 12,778). DOL says it will assign the occupation using the Office of Management and Budget's Standard Occupational Classification system (Final Rule at 12,776), unless it can assign any task to more than one occupation (Final Rule at 12,778). In that case, DOL will assign an AEWR necessary to produce the highest possible wage. If the task-based categorization does not produce a high wage, DOL says it will evaluate the "totality of circumstances" (Final Rule at 12,779) in assigning the occupation, but it will exclude the work actually performed from the test. Using this partial totality of the circumstances test, DOL will then assign the occupation producing the highest wage.

10. Third, the Final Rule offers no explanation, much less a rational one, linking its statutory mandate to any of these significant policy choices. DOL failed to acknowledge that, much less explain why, it has decided to supplant the single best survey of agricultural wages for a survey that does not even collect data from farmers and ranchers. DOL failed to acknowledge, much less justify, that its use of the SOC system is fundamentally incompatible with the system as used by DOL itself in other programs. DOL failed to acknowledge, much less justify, that its task-based classification system allows it to assign occupations unpredictably with neither rhyme nor reason.

11. Finally, DOL failed to make even a minimal effort to get the information it needed to make these incredibly important policy decisions. After repeatedly asserting that the Final Rule will not affect 98% of the agricultural occupations (except those reassigned pursuant to its 'partial totality of the circumstances' test), DOL admits that it "may have

5

underestimated" the costs of the Final Rule. Final Rule at 12,785. But then DOL states that it could not estimate those costs because the data was not "readily accessible." But DOL has in its records tens of thousands of H-2A applications and job descriptions and thus has all the data needed. The data is readily accessible; only DOL decision not to consider it rendered it 'inaccessible.' DOL's decision to ignore this data is the antithesis of the reasoned decision-making required by the APA.

12.     The Final Rule will devastate tens of thousands of farmers and ranchers who participate in the H-2A Program as well as their domestic and H-2A workforce. DOL officials, in sworn testimony, expect wages to increase enormously in the three most important agricultural occupations targeted by the new rule. Farmers and ranchers whose workers are deemed "Construction Laborers" will see their labor costs increase from a low of 23% (Arkansas) to a high of 151% (New York). If the workers are deemed to be "First Line Supervisors," the increase will be 85.6% (Idaho) to 156.6% (New York). That will inflict severe and irreparable financial injury on thousands of H-2A farmers and ranchers in increased labor costs. Other farms and ranches will reduce the size and scope of their operations undoing years of hard work and sacrifices – because DOL thinks it appropriate to protect non-agricultural labor markets from the employment of H-2A visa holders.

## II.     JURISDICTION

13.     The Court has jurisdiction to hear this case under 28 U.S.C. § 1331, Federal Question Jurisdiction. This matter arises under 5 U.S.C. §§ 701-706, the Administrative Procedure Act.

### III. VENUE

14. The U.S. District Court for the Western District of North Carolina is a proper venue for this action under 28 U.S.C. § 1391(e)(1)(C) because the defendants are officers of the United States, plaintiff USA Farm Labor, Inc. resides within the district in Waynesville, North Carolina, and no real property is involved in this action.

### IV. THE PARTIES

15. Plaintiff USA Farm Labor, Inc. is an H-2A agent. Its principal business is submitting H-2A applications on behalf of farms. USA Farm Labor, Inc. is among the top three agents using the H-2A program, submitting over 800 applications annually, most of which covers multiple workers. We have a number of clients whose applications only cover one worker. USA Farm Labor, Inc. is among the top three H-2A filing agents nationwide. It navigates farmers through the H-2A program's complexities. Because of the anachronisms and nonintuitive aspects of the H-2A program their expertise is vital to farmers needing H-2A workers. USA Farm Labor is headquartered in Waynesville, North Carolina, and has a nationwide client base.

16. Plaintiff JCP Farms, LLC, is a fourth-generation family farm headquartered in Long Prairie, Minnesota.

17. Plaintiff Lazy BS Bar, Inc., is a third-generation family farm headquartered in eastern Montana.

18. Plaintiff B&B Agri Sales, LLC, is a third-generation family-run agri-business headquartered in Dodge, Wisconsin.

19.     Plaintiff Hoggard Farms is a fourth-generation family farm headquartered in southeast Missouri.

20.     Plaintiff Masching Agriculture, LLC, is a third-generation family farm headquartered in Livingston County, Illinois.

21.     Plaintiff Hutto Grain is a family farm headquartered in Kansas.

22.     Plaintiff KD Farm & Ranch is a fourth-generation family farm headquartered in Kingman, Kansas.

23.     Plaintiff Circle D Farms is a family farm headquartered in southern Colorado.

24.     Plaintiff Triple T Farms, Inc., is a seventh-generation family farm headquartered in Thomas County, Kansas.

25.     Plaintiff Bebb Farms is a family farm headquartered in Kansas.

26.     Plaintiff Jamerson Farms is a third-generation family farm headquartered in Hornersville, Missouri.

27.     The plaintiff farms (all plaintiffs except USA Farm Labor, Inc.) hire foreign nationals through the H-2A program due to a lack of available U.S. workers.  The Final Rule would make it impossible for plaintiff farms to operate profitably, sending their profits overseas to foreign workers rather than keeping the profits domestically.  The Final Rule endangers plaintiff farms' ability to continue operating.

28.     Defendant Julie Su is the Acting Secretary of Labor and responsible for supervising its operations.

8

29.     Defendant Brent Parton is the Acting Assistant Secretary of Labor in charge of DOL's Employment and Training Administration.

30.     Defendant Brian Pasternak is the Administrator of DOL's Office of Foreign Labor Certification.

31.     Congress has vested in the Secretary of Labor the authority to issue temporary labor certifications which are necessary to apply for H-2A visas.  The Secretary has delegated that authority to the Assistant Secretary for the Employment and Training Administration, who has subdelegated that authority to the Administrator of the Office of Foreign Labor Certification.

32.     All government defendants are sued in their official capacities.

## V.     FACTUAL ALLEGATIONS

### A.  Background on the H-2A Program

33.     Congress created the current H-2A program in 1986 to balance the needs of farmers and domestic laborers.  *See* Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 2986 § 301 (Nov. 6, 1986), *codified at* 8 U.S.C. §§ 1188 *et seq*.  IRCA made it illegal to knowingly employ an unauthorized worker.  To enforce this prohibition, IRCA created a national employment verification system.  IRCA required each employer to verify that a prospective employee is authorized to work. Congress, however, was concerned that adopting a system of employment verification would disrupt agricultural labor markets, given the perception that a high percentage of agricultural workers were not authorized to work in the United States.  To ensure that the contemplated employment verification system would not disrupt labor markets, IRCA

9

revamped the H-2 Program into an agricultural (H-2A) and non-agricultural (H-2B) program. Deputy Secretary of Agriculture John Norton III explained to Congress:

> In agriculture, undocumented workers are primarily engaged in seasonal harvest work throughout the U.S. As we move toward implementation of employer sanctions, we must at the same time prevent labor shortfalls and dislocations which have the potential to disrupt harvests and interfere with the marketing process. The national economy and the American consumer depend upon a stable and adequate supply of agricultural labor to maintain commodity supplies at reasonable prices.[5]

34.     The H-2A visa program and the lifeline it provides to law-abiding farmers and ranchers is thus an essential element of IRCA's overall policy of eliminating illegal immigration. *AFL-CIO v. Dole*, 923 F.2d 182, 184 (D.C. Cir. 1991).

35.     As a part of IRCA, the H-2A visa program's overarching purpose is to reduce illegal immigration by eliminating unauthorized employment opportunities. The H-2A visa program has two more specific purposes. First, it is to protect the jobs of citizens from being displaced by H-2A workers or unauthorized workers. Second, it is to assure farmers and ranchers access to an adequate authorized labor force so they can produce the food the nation eats. Any statutory scheme with these purposes must inevitably strike a balance between them. *See Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977).

36.     Congress struck the original balance in IRCA itself. Under the H-2A program, a visa may be granted to a worker "who is coming temporarily to the United States to perform agricultural labor or services … of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Before a visa may be issued, the Secretary of Labor must

---

[5] Testimony of Deputy Secretary of Agriculture John R. Norton III before the House Subcommittee on Immigration Refugees, and International Law, Sept. 30, 1985, reprinted in 1986 U.S. Code Cong. & Admin. News at 5687.

certify that there are no domestic workers available and "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States **similarly employed**." 8 U.S.C. § 1188(a)(1)(B) (emphasis added). Thus, adverse effects are protected against only for workers "similarly employed."

37.     DOL protects the wages of workers in the United States who are "similarly employed" to the H-2A workers through the AEWR.[6] The AEWR's goal is market neutrality: that hiring a prospective H-2A worker will neither increase nor decrease the market wage in the occupation in which he or she will work. The AEWR is "an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers. *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976).

38.     It is difficult, if not impossible, to identify the specific "adverse effect" from the entrance of a single H-2A worker on U.S. workers in the same occupation. DOL's solution has been to use the Department of Agriculture's Farm Labor Survey to estimate the market wages for agricultural occupations. It has used the Farm Labor Survey to identify market wages since the H-2 program's inception in 1953 through IRCA in 1986 up to the present. DOL briefly experimented using its non-agricultural OEWS survey to identify agricultural wages between January 2009 and February 2010 then rejected this approach.

---

[6] There are other wage standards. As they do not play a role in this case, this Complaint omits them.

39.     The primary reason DOL rejected the OEWS survey for setting the AEWR is that the survey's data does not provide reliable information about agricultural wages. Rather, its data provides information about non-agricultural occupations. DOL recognized that it should not set the H-2A minimum wage based on wages paid to people who are not similarly employed to farm and ranch workers.

## B. **The 2023 Final Rule**

39.     DOL issued a Notice of Proposed Rulemaking on December 1, 2021, which proposed to change the methodology for assigning AEWRs.[7] On February 28, 2023, DOL adopted the proposed rule with no changes.[8]

40.     Summarizing the new rule is difficult because the agency says different things in different places about what the rule actually is and how it will be applied in practice. The new rule starts by assigning a Standard Occupational Classification ("SOC") code to each job, similar to the prior practice. Final Rule at 12,760. The SOC system is a data collection scheme that classifies every job in the United States into one of approximately 800 occupational categories. The SOC system is administered by the Office of Management and Budget, not DOL. 31 U.S.C. § 1104(d); 44 U.S.C. § 3504(e). Federal statistics reporting agencies are required to use it.[9]

---

[7] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 86 Fed. Reg. 68,174 (Dec. 1, 2021).
[8] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12,760 (Feb. 28, 2023).
[9]     Bureau of Labor Statistics, "Revising the Standard Occupational Classification" 1, 2018, https://www.bls.gov/soc/revising_the_standard_occupational_classification_2018.pdf.

41.    The new AEWR methodology then requires DOL to analyze the job description to determine if it includes any task that is performed by another occupation. If it does, DOL will locate all other occupations that include that task. After doing that, DOL will compare wages for all the occupations listed and assign the highest for the purposes of setting the AEWR.

42.    If DOL applies this method faithfully, it will have to reassign the occupation for nearly every H-2A application as there is usually at least one task that overlaps with at least one other occupation. Nevertheless, the Department says that most assignments will not change while also stating that it does not know how many wage assignments will change. Compounding the problem, DOL has instructed its personnel and its state level partners to classify jobs based on what occupation "seems" to be the best fit for the job.

43.    DOL repeatedly states that 98% of the jobs will not be reclassified. DOL states that it will continue relying on the Farm Labor Survey for six occupations included in the "field and livestock workers (combined)" category. This includes the following occupations:

- 45-2041 – Graders and Sorters, Agricultural Products
- 45-2091 – Agricultural Equipment Operators
- 45-2092 – Farmworkers and Laborers, Crop, Nursery, and Greenhouse
- 45-2093 – Farmworkers, Farm, Ranch, and Aquacultural Animals
- 53-7064 – Packers and Packagers, Hand
- 45-2099 – Agricultural Workers, All other

Final Rule at 12,794.

44.    For these six occupations, DOL claims it will set one statewide AEWR based on the Farm Labor Survey if a wage is reported there. If the Farm Labor Survey does not

13

report a wage, then DOL will look to the Occupational Employment and Wage Statistics ("OEWS") survey, a non-agricultural labor market survey that does not collect data from fixed-site farms. Final Rule at 12,801.

45. The Final Rule repeatedly states that 98% of jobs will continue to be judged according to the Farm Labor Survey, like before. *See, e.g.*, Final Rule at 12,775. But this cannot be squared with the overlapping duties rule, which will require use of the nonagricultural OEWS survey for most applications because overlapping duties are common. Despite relying repeatedly on the 98% number as central justification for its rule, DOL admits "we may have underestimated the impact" and the agency "does not have any data readily available to estimate the number of workers that may have their SOC codes reclassified." Final Rule at 12,785.

46. The Final Rule states that it applies to all job orders (the first step of an H-2A application) submitted on or after March 30, 2023. *Id.* at 12,802. However, the H-2A regulations require H-2A employers to pay the AEWR that is in effect when the H-2A work is performed. DOL has the authority to increase the AEWR mid-season upon notice. Plaintiffs fear that DOL will attempt to retroactively increase the AEWR. The Office of Foreign Labor Certification will publish a notice in the Federal Register at least once per year establishing each AEWR. *Id.*

**D. Impact of the 2023 Final Rule on Plaintiffs**

47. The Final Rule will dramatically increase the cost of farm and ranch labor and the food which farms and ranches produce. It will also reduce the number of employers who use the H-2A program.

48. Plaintiff USA Farm Labor, Inc. receives its income from helping 800 - 900 farms apply for H-2A visas. It surveyed its clients and asked whether they would continue using the H-2A program if the Final Rule takes effect. Sixty-four percent of its clients said they would stop using the H-2A program, 33% were uncertain, and only 3% said they would continue using it. The Final Rule will reduce the income of USA Farm Labor, Inc. by $635,800 to $3M annually. The lower figure is assuming that all uncertain farms and survey non-respondents will continue to use the H-2A program. The higher figure is assuming that the survey results represent likely behavior even for those who did not respond to the survey.

49. B&B Agri Sales is representative of plaintiff farms in this case and farmers across the country. B&B, like most farmers, is located in a rural pocket of the country where the labor market is already sparse. It has not had success in luring many U.S. workers to join their team of over 12 employees. To fill the gap it uses eight H-2A workers.

50. Each of B&B's employees fills a variety of roles and responsibilities during a given week. Employees drive trucks to grain terminals that are 12-25 miles away from the farm. None of the trucks are driven more than 7,500 miles per year. Employees are selected and retained based on their ability to perform multiple jobs. At some point every H-2A employee will have to operate equipment or drive trucks.

51. Under the prior wage rule, last year the AEWR for Wisconsin was $15.37 per hour. This was raised this year to a base rate of $17.34 per hour: a 13% increase. This alone is a difficult burden to bear, but the new wage rule goes further. Under the Final Rule B&B would be required to pay its workers the truck driver rate of $24.34 per hour.

15

52.     Because their employees occasionally drive grain trucks 12-25 miles away,

B&B will be required to pay workers an additional $8.97 per hour under the new rule.  The

annualized cost for labor will increase a total of $215,280[10].

53.     On a per employee basis, B&B's cost of labor will increase by a minimum

of $22,500.

54.     Adding insult to injury, DOL processing delays have spiked in recent years,

delaying the availability of workers and shortening the growing season.  The new method

will dramatically increase the time DOL takes to process the wage requirements, as they

compare multiple sources and find the highest wage.

### Cause of Action
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)

#### A.  Violation of 706(2)(A) and (C): The Final Rule Contradicts the Plain Language of the Statute

60.     The APA, at 5 U.S.C. 706(2), requires courts to hold unlawful agency rules

that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law...(C) in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right...and, (E) unsupported by substantial evidence..."

61.     The APA requires this Court to hold unlawful and set aside any agency action

that is "not in accordance with law," or exceeds the agency's authority. 5 U.S.C. §

706(2)(A) and (C). Regulations "that are contrary to clear congressional intent or frustrate

the policy that Congress sought to implement must be rejected." *Earth Island Inst. v.*

---

[10] Based upon the following: $8.97/hour wage increase x 12 workers x 50 hours/week x 40 weeks.

*Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007); *see also Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs*., 946 F.3d 1100, 1112 (9th Cir. 2020).

62.    In determining the scope of an agency's statutory authority and limits of discretion, the courts generally search the statute for an "industry-specific" rule that constrains the agency and if the legislative history supports the rule.  *See Pharm. Research & Mfrs. of Am. v. FTC*, 44 F. Supp. 3d 95, 119 (DDC 2014) (noting a lack of such a standard left room for the agency "to fill in the gaps") citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984).

63.    If Congress has created an industry-specific standard the agency must follow it.  *See id*. If the statute is silent the agency has latitude to craft its own standards.  *Id*.

64.    Here, Congress has spoken, and it created an industry-specific standard that limits the Department's ability to craft its own rules. 8 U.S.C. § 1188(a)(1)(B).  That standard requires DOL to determine if: "the employment of the alien in such labor or services will [] adversely affect the wages and working conditions of workers in the United States similarly employed."

65.    This provision creates an industry-specific rule requiring the Department to compare agricultural worker wages with other similarly employed agricultural worker wages.  In essence the statute mandates an "apples to apples" approach.  *See id*.

66.    Statute requires DOL to protect the wages of workers who are "similarly employed."  *Id*.  This phrase begs the question: similar to whom?  The statute contains an answer: "an H-2A worker."  8 U.S.C. § 1188(a)(1).  "An H-2A worker" is further defined

17

by reference to the definition of an H-2A worker under immigration law. 8 U.S.C. § 1188(i)(2) ("The Term 'H-2A worker' means a nonimmigrant described in 8 U.S.C. 1101(a)(15)(H)(ii)(a)). The definition of an H-2A worker under immigration law is firmly rooted in agricultural labor. An H-2A worker must intend "to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature." 8 U.S.C. 1101(a)(15)(H)(ii)(a). The statute is firmly rooted in agricultural labor. Yet DOL ignores these anchors, choosing instead to protect the wages of non-agricultural workers.

67. Further confirmation comes elsewhere in IRCA. Farmers and ranchers seeking to hire H-2A workers must state the job requirements, and DOL must evaluate whether the stated job requirements are appropriate. "In considering the question of whether a specific qualification is appropriate in a job offer, the Secretary shall apply the normal and accepted qualifications required by non-H–2A employers *in the same or comparable occupations and crops*." 8 U.S.C. § 1188(c)(3)(A) (emphasis added). Thus, when comparing H-2A workers to non-H-2A workers, the comparison should even be limited to laborers who work with the same agricultural product, another stricture that is ignored by the Final Rule.

68. The Department gives lip service to the correct interpretation of its statutory mandate in its preamble to the Final Rule, stating: "rulemaking is necessary to ensure that the employment of H–2A foreign workers will not have an adverse effect on the wages of *agricultural workers* in the United States *similarly employed*." Final Rule at 12,761

(emphasis added).  But DOL then abandons this reading and shifts its focus to the much larger market for non-agricultural labor.  Final Rule at 12,671.

69.     According to the Final Rule agricultural worker wages for six SOC Codes, covering field and livestock workers, will be determined by parsing out the job duties and then comparing those duties with non-agricultural SOC Codes.  The Department then determines the agricultural wage by finding the single job duty that overlaps with the highest paying nonagricultural SOC Code.  The Department aims to implement this rule without considering the percentage of time the agricultural worker will spend on the solitary, highest paying, job duty.

70.     Notably, if an agricultural worker's job description includes occasionally driving a grain truck a short distance to a grain elevator the Department will now require the employer to pay the worker the same wage as a long-haul trucker who primarily and repeatedly drives long distance for non-agricultural entities.

71.     Here, IRCA unambiguously sets an industry-specific standard.  That industry-specific standard constrains the Department to compare "apples to apples" (agricultural workers with agricultural workers) and eschews the Department's proposed apples to oranges wage rule (comparing agricultural workers with nonagricultural workers).  Moreover, the legislative history, which focuses on food security and similarly employed agricultural workers wages, does not support the agency's rule.

**B.  Violation of 706(2)(A): The Final Rule is Arbitrary and Capricious**

72.     When crafting rules, the Department is required to "examine the relevant data and articulate a satisfactory explanation for its action." *Physicians for Social Responsibility*

19

*v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020), *quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

73.     First, the Final Rule fails to justify its decision to measure adverse effect in *agricultural* labor markets through comparisons with *non-agricultural* wages, thereby violating the "'fundamental requirement of administrative law … that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

74.     Courts set aside rules if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

75.     The Final Rule offers no explanation or analysis indicating it considered the impact it would have on U.S. workers and how it would negatively affect its statutory mandate to protect their wages and working conditions.

76.     The Final Rule fails to discuss or analyze the impact it will have on the ability of farmers and ranchers to pay these substantially higher wage rates and the likelihood that farmers and ranchers will be forced to scale back operations or close altogether.  The Rule does not consider the fact that farmers and ranchers lack pricing power and are not capable of passing costs onto consumers, making it impossible to pay the increase in both H-2A and U.S. workers' wages and still make a profit.

77.     Likewise, the Final Rule fails to consider the fact that many employers, when faced with the choice to quit farming profitably or hire undocumented workers, will choose

the latter. This Rule will increase the number of unauthorized workers in the agricultural sector thereby further depressing similarly employed U.S. workers' wages and working conditions.

78. The Final Rule fails to explain why it has decided to supplant the single best survey of agricultural wages for a survey that does not even collect data from farmers and ranchers.

79. The Final Rule's use of the SOC Classification in the H-2A program is fundamentally incompatible with that system. The OMB, and every agency using the SOC codes, have a bright line rule that each worker in the economy has one applicable SOC Code. The Final Rule transgresses that precept and assigns multiple codes to a worker based on job duties.

80. The Final Rule does not create any predictability in the H-2A program, as there are no standards that will guide employers through this task-based classification system to the wage the Department will approve. The Rule creates a dynamic where the Department can assign occupations unpredictably with neither rhyme nor reason.

81. Finally, the new rule is not based upon substantial evidence. DOL failed to get the information it needed to make these incredibly important policy decisions. After repeatedly asserting that the Final Rule will not affect 98% of the agricultural occupations (except those reassigned pursuant to its 'partial totality of the circumstances' test), DOL admits that it "may have underestimated" the costs of the Final Rule. But then DOL states that it could not estimate those costs because commenters did not provide the data. Final Rule at 12,785. But DOL has in its records tens of thousands of H-2A Applications and

21

job descriptions and thus has all the data needed. DOL's decision to ignore this data is the antithesis of reasoned decision-making and intentionally avoids amassing substantial evidence upon which a rule could be based.

### C. Violation of 706(2)(A): The Final Rule is not the Product of Reasoned Decision Making

82.     Courts demand agency rules be the product of reasoned decision making. *Shays v. FEC*, 528 F.3d 914, 929 (D.C. Cir. 2008). ("Though the Commission certainly has some discretion in choosing exactly where to draw a bright line such as this one, it must support its decision with reasoning and evidence, for 'a bright line can be drawn in the wrong place.'").

83.     The Department failed to engage in a reasoned decision-making process when it abandoned the prior wage system, that compared workers in similar agricultural SOC codes and relied on the Farm Labor Survey. The prior system was jettisoned in favor of the new wage rule formulation, which includes comparisons with non-agricultural SOC codes and abandons the Farm Labor Survey altogether.

84.     Although the Supreme Court explained in *Encino Motorcars, LLC v. Navarro*, that agencies remain "free to change their existing policies," they still must "provide a reasoned explanation for the change." 136 S. Ct. 2117, 2125, 195 L. Ed. 2d 382 (2016).

85.     To satisfy the reasoned decision-making requirement the law requires the Department to create one rule and logically explain it. *See Encino Motorcars,* 136 S. Ct. 2117. Here the Department has failed on both counts. First, it fails to identify a single

controlling rule, but leaves the regulated industry guessing at which of three rules it is actually promulgating.

86.     The three rules in Final Rule adopt multiple tests for classifying jobs – all of which are inconsistent and provide absolutely no real notice about how jobs are to be classified.  All stakeholders are left guessing what the standards are for setting wages, including DOL adjudicators, administrative law judges, enforcers from the Wage and Hour division, and the public.  The Final Rule goes from saying 98% of jobs will be unchanged to applying a totality of the circumstances test that rejects the single most important circumstance – what the workers actually do – to saying that it may reject the result of the totality test if it wants.  Agency regulations are arbitrary and capricious where they rely on reasoning that is "internally inconsistent and inadequately explained." *Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (quoting *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015)).

87.     Next, the lack of a logically consistent rationale for abandoning the Farm Labor Survey and the agency's failure to consider reliance interests dooms its rule. Nothing in the preamble gives a plausible explanation why the Department has abandoned the Farm Labor Survey, which it has previously determined to be the most accurate indicator of agricultural wages, in favor of its new approach.

88.     The Department does not address the fact that farmers have built businesses relying on the prior wage system.  All of their long-term financial projections rely on what was a relatively predictable cost of labor.  The Department has inflated farmers' costs through the Final Rule without considering how farmers' long term operational plans have

relied on the prior system or how this will impact their ability to farm profitably.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. at 106.

89.     The Department ignores reliance interests and the fact that farmers have increased the scope of their operations through compliance with the H-2A program.  Unlike other industries, farmers are not capable of controlling the price of goods sold.  Rather they are "price takers."  This creates an inability to pass increased cost on to purchasers.  The inevitable result is the Final Rule will force plaintiffs to exit the H-2A program and farming altogether.  The Final Rule does not weigh the reliance interests that plaintiffs possess in the former wage rule.

90.     Even if Plaintiffs could pass on increased costs the Final Rule fails to consider the reliance interests consumers have in reasonably priced food.  Passing increased costs on would force many people on the margins into hunger.

91.     For the foregoing reasons, this Court must set aside this rule.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully seek the following relief:

a.      Preliminary and permanent injunctive relief preventing Defendants from implementing or enforcing the Final Rule;

b.      An order vacating and setting aside the Final Rule;

c.      A declaration that the Final Rule is unlawful under the Administrative Procedure Act;

d.      Awarding plaintiffs their costs and attorney's fees; and

e.      Such other relief as the Court deems just and proper.

This the 10th day of April, 2023.


/s/ PATRICK H. FLANAGAN
Patrick H. Flanagan, NC Bar #17407
Cranfill Sumner LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
phf@cshlaw.com

Wendel V. Hall (PHV forthcoming)
Hall Global
1350 Connecticut Ave, N.W., Suite 1220
Washington, DC 20036
Telephone: 202-744-3250
wendel@halllawoffice.net

Jonathan Wasden (PHV forthcoming)
Wasden Law
12020 Sunrise Valley Drive, Suite 100
Reston, VA 20191
Telephone: 703-216-8148
jon@wasden.law

Mark Stevens (PHV forthcoming)
Clark Hill PLC
1001 Pennsylvania Ave. NW, Suite 1300 South
Washington, DC 20004
Telephone: 202-552-2358
mstevens@clarkhill.com

*Counsel for Plaintiffs*

**EXHIBIT 1**

**Abbreviations Used in This Complaint**

DOL or Department;  The U.S. Department of Labor

AEWR;     Adverse Effect Wage Rate

OEWS:     The Bureau of Labor Statistics' Occupational and
        Employment Wage Statistics survey

APA:      Administrative Procedure Act

SOC:      Standard Occupational Classification

IRCA:      Immigration Reform and Control Act