# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CASE NO. 1:23-CV-96-MR-WCM

| | |
|---|---|
| **USA FARM LABOR, INC.,** *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JULIE SU, in her official capacity** | ) |
| **as Acting Secretary of Labor,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DENA J. KING
United States Attorney

WILLIAM C. PEACHEY
Director

GILL P. BECK
Assistant United States Attorney
United States Attorney's Office
Room 233, U.S. Courthouse
100 Otis Street, Room 233
Asheville, NC 28801
Telephone: 828-259-0645
gill.beck@usdoj.gov

GLENN M. GIRDHARRY
Deputy Director

AARON S. GOLDSMITH
JOSHUA S. PRESS
Senior Litigation Counsels
U.S. Dept. of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-0106
joshua.press@usdoj.gov

*Attorneys for Defendants*

## TABLE OF CONTENTS <span style="float:right">Page</span>

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................3

    I.    Statutory and Regulatory Background .....................................................3

    II.   Factual and Procedural Background ......................................................10

STANDARD OF REVIEW ................................................................................11

ARGUMENT ....................................................................................................12

    I.    The Farm and Agri-Business Plaintiffs Lack Standing Without
         Any "Certainly Impending" Harm ........................................................12

    II.   The Plaintiffs Have Failed to Show Irreparable Harm .........................15

CONCLUSION .................................................................................................18

# TABLE OF AUTHORITIES

**Cases**                     **Page(s)**

*Adams v. Bain,*
 697 F.2d 1213 (4th Cir. 1982) ....................................................................12

*AFL-CIO v. Brock,*
 835 F.2d 912 (D.C. Cir. 1987) ................................................................ 4, 5

*AFL-CIO v. Dole,*
 923 F.2d 182 (D.C. Cir. 1991) ................................................................ 3, 4

*Carney v. Adams,*
 141 S. Ct. 493 (2020) ........................................................................... 13, 17

*City of Los Angeles v. Lyons,*
 461 U.S. 95 (1983) .....................................................................................2

*Constantine v. Rectors & Visitors of George Mason Univ.,*
 411 F.3d 474 (4th Cir. 2005) ....................................................................11

*Garcia v. Acosta,*
 292 F. Supp. 3d 93 (D.D.C. 2019) ............................................................13

*Griffin v. Dep't of Labor Fed. Credit Union,*
 912 F.3d 649 (4th Cir. 2019) ............................................................... 13, 14

*Holloway v. Pagan River Dockside Seafood, Inc.,*
 669 F.3d 448 (4th Cir. 2012) ....................................................................11

*Hutton v. Nat'l Bd. Of Exam'rs in Optometry, Inc.,*
 892 F.3d 613 (4th Cir. 2018) ....................................................................11

*Kowalski v. Tesmer,*
 543 U.S. 125 (2004) ..................................................................................17

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555, (1992) ..........................................................................*passim*

*Menders v. Loudon Cnty. Sch. Bd.,*
    65 F.4th 157 (4th Cir. 2023) ................................................................. 14, 17

*Netro v. Greater Balt. Med. Ctr., Inc.,*
    891 F.3d 522 (4th Cir. 2018) ...................................................................... 2

*Spokeo v. Robins,*
    578 U.S. 330 (2016) ........................................................................... 14, 15

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..................................................................................... 1

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ........................................................................ 1, 14

*UFW v. Chao,*
    227 F. Supp. 2d 102 (D.D.C. 2002) .......................................................... 4

*UFW v. DOL,*
    598 F. Supp. 3d 878 (E.D. Cal. April 4, 2022) ...................................... 7, 8

*UFW v. Perdue,* No. 20-cv-01452,
    2020 WL 6318432 (E.D. Cal. Oct. 28, 2020) ........................................... 7

*UFW v. Perdue,* No. 20-cv-01452,
    2020 WL 6939021 (E.D. Cal. Nov. 25, 2020) .......................................... 7

*UFW v. Solis,*
    697 F. Supp. 2d 5 (D.D.C. 2010) .............................................................. 5

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ....................................................................... 15, 16

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ........................................................................... 13, 14

*Williams v. United States,*
    50 F.3d 299 (4th Cir. 1995) ..................................................................... 12

**Statutes**

8 U.S.C. § 1188(a)(1)(A) ...................................................................................3

Pub. L. No. 99-603 .............................................................................................5

**Regulations**

20 C.F.R. § 655.103(b) ......................................................................................6

20 C.F.R. § 655.103(b) ....................................................................................10

20 C.F.R. § 655.120(a) ......................................................................................3

# INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Defendants, by and through their undersigned counsel, hereby move to dismiss the Plaintiffs' Second Amended Complaint, ECF No. 10 (hereinafter, "Complaint" or "Compl.") for lack of jurisdiction. This case is an Administrative Procedure Act ("APA") challenge to the United States Department of Labor's ("DOL") final rule modifying the methodology for calculating the Adverse Effect Wage Rate ("AEWR") for the H-2A Temporary Labor Certification Program ("H-2A Program"). More specifically, Plaintiffs seek universal vacatur of the rule DOL published at *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12760 (Feb. 28, 2023) ("2023 Rule") because they believe it both exceeds the Immigration and Nationality Act ("INA") and violates the APA. *See* Compl. at 25 (Prayer for Relief).

But none of the Plaintiffs demonstrate that they have the irreducible minima of Article III standing necessary to maintain this lawsuit. Article III jurisdictional requirements are essential to maintain the proper separation of powers between the three co-equal branches of government. *See, e.g., TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). In order to establish Article III standing, a plaintiff must satisfy the three elements enunciated by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992). Under the first *Defenders* element, "the plaintiff must have suffered an 'injury in fact'—

an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted). The second element requires "a causal connection between the injury and the conduct complained of." *Id.* As for the third element, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). Additionally, where injunctive relief is sought, the plaintiff must show a "real or immediate threat that [she] will be wronged again." *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

These elements have not been satisfied here because the Plaintiffs do not have any current labor certifications or pending H-2A applications that are or will be affected by the 2023 Rule. *See generally* ECF No. 38-1, Declaration of Shane Barbour ("Barbour Decl."). Nor have Plaintiffs alleged that they intend to submit labor certifications or applications that will be affected by the 2023 Rule. *See id.* This problem requires dismissal because plaintiffs must have standing at the time their complaint is filed. *See Defenders of Wildlife*, 504 U.S. at 571 n.5; *Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 526 (4th Cir. 2018). In short, without any ongoing or imminent injury, the Plaintiffs here lack standing and this case should be dismissed for lack of subject matter jurisdiction.

# BACKGROUND

## I. Statutory and Regulatory History

### A. H-2A Temporary Agricultural Visa Program and the AEWR

The H-2A visa program permits U.S. agricultural employers to hire foreign workers on a temporary basis "to perform agricultural labor or services ... of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In enacting the H-2A Program, Congress directed DOL to strike a balance between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers." *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991) (Silberman, J.). Accordingly, before an employer can file a visa petition with the United States Department of Homeland Security ("DHS"), they must first seek a temporary labor certification from DOL that (1) there "are not sufficient workers" able, willing, and qualified to perform the labor at issue and (2) issuance of the H-2A visa "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(A), (B); *see also* 8 C.F.R. § 214.2(h)(5)(i)(A). DOL meets § 1188's requirements, in part, by requiring employers to offer, advertise in their recruitment, and pay a wage that is the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, the federal minimum wage, or the state minimum wage. *See* 20 C.F.R. §§ 655.120(a), 655.122(l).

The AEWR "is one of the primary ways the Department meets its statutory obligation to certify that the employment of H-2A workers will not have an adverse

effect on the wages of agricultural workers in the United States similarly employed." 88 Fed. Reg. at 12761. The AEWR "is designed to prevent the potential wage-depressive impact of foreign workers on the domestic agricultural workforce." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) ("2010 Rule"). In designing the AEWR methodology, DOL sets a "rate [that] will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression." *Dole*, 923 F.2d at 187. Congress has not set a method for calculating the AEWR; rather, "calculating AEWRs has been left entirely to [DOL's] discretion." *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987).

### B. *Prior Methodologies for Calculating the AEWR*

"DOL has used a number of methods for calculating the AEWR over the years." *UFW v. Chao*, 227 F. Supp. 2d 102, 108 n.13 (D.D.C. 2002). Beginning in 1963, DOL established a series of state AEWRs. 54 Fed. Reg. 28040 (July 5, 1989). These AEWRs were calculated using average hourly earnings from the 1959 Census of Agriculture, adjusted by a United States Department of Agriculture ("USDA")-determined index. *Id.* In 1965, DOL began setting AEWRs using average hourly farm wages from the 1950 Census of Agriculture. *Id.*; *see also* 29 Fed. Reg. 19101 (Dec. 30, 1964). Beginning in 1968, AEWRs were computed by adjusting the previous year's rate by the annual change in farmworker wages as reflected in USDA surveys. 54 Fed. Reg. at 28040 (also changing DOL methods). In 1987, DOL issued a new methodology that caused the

AEWRs to decrease.[1] Instead of adjusting the prior year's rate by the percentage increase in farmworker wages measured by USDA's Farm Labor Survey ("FLS") (or "what the [D.C. Circuit] viewed as the prior practice of providing for an enhancement to correct for the past employment of legal and undocumented aliens"), the revised methodology simply set rates at the prior year's wages from USDA's survey. *Id.*

In December 2008, DOL promulgated a new AEWR methodology, effective in January 2009, that used the Occupational Employment Statistics ("OES") survey, administered by the Bureau of Labor Statistics ("BLS"), rather than USDA's FLS, to set the AEWRs for all H-2A job opportunities, subject to four "skill" levels that established the AEWR for an occupation based on an arithmetic formula. 73 Fed. Reg. 77110, 77176–77 (Dec. 18, 2008). DOL justified utilizing OES data because, *inter alia*, USDA "could terminate the [FLS] survey at any time and leave [DOL] without the basic data" to calculate the AEWR. *Id.* at 77174. That possibility "add[ed] a measure of instability and uncertainty for AEWR determinations in future years" that warranted a methodology that did not rely on the FLS. *Id.* at 77173. This change was upheld. *See UFW v. Solis*, 697 F. Supp. 2d 5, 8–11 (D.D.C. 2010).

---

[1]   DOL issued this methodology after the enactment of the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (Nov. 6, 1986). The IRCA subdivided the H-2 temporary worker visa program into the H-2A and H-2B programs and codified "the adverse effect prohibition that the Department had earlier introduced by regulations." *AFL-CIO*, 835 F.2d at 914.

Effective March 15, 2010, DOL again revised its AEWR methodology, reverting back to its reliance on the FLS survey. 20 C.F.R. § 655.103(b); *see also* 75 Fed. Reg. at 6891. In explaining its decision to do so, DOL observed that the FLS "actually uses information sourced directly from farmers," while the OES "includes data from employers who operate farm support operations, including contract suppliers of temporary farm labor." 75 Fed. Reg. at 6898.

In 2019, as part of a larger proposal to revise its H-2A program regulations, DOL again proposed changes to the AEWR methodology. DOL proposed to set the AEWR at the annual average hourly gross wage for a particular agricultural occupation in the State or region, as reported by the FLS when such data was available, and at the statewide annual average hourly wage for the Standard Occupational Classification ("SOC") from the OES survey if the FLS did not report a wage in a State or region. *See* 84 Fed. Reg. 36168, 36181 (July 26, 2019) ("2019 NPRM"). DOL explained that the FLS collects data by SOC, but it does not report wages at that level of specificity. 84 Fed. Reg. at 36181. Instead, the FLS reports four wage rates per State or region: (1) field workers,[2] (2) livestock workers,[3] (3) field and livestock workers combined, and (4)

---

[2]   "Field workers include employees engaged in planting, tending and harvesting crops, including operation of farm machinery on crop farms." 80 Fed. Reg. 20300, 20308 (Apr. 15, 2015).

[3]   "Livestock workers include employees tending livestock, milking cows or caring for poultry, including operation of farm machinery on livestock or poultry operations." 80 Fed. Reg. at 20308.

all hired workers. *Id.* Under the 2010 Rule, the AEWR was established using the annual average hourly wage data for workers within the combined field and livestock category in the FLS despite wage data for certain, generally higher skilled, occupations not being included in that data. *Id.* The proposed change in the 2019 NPRM was intended to produce more accurate AEWRs. *Id.* at 36171.

In the fall of 2020, however, the USDA announced its intent to suspend the FLS. *See* 85 Fed. Reg. 61719 (Sept. 30, 2020). Facing the prospect of having no source for calculating AEWRs, DOL separated the AEWR portion from its larger 2019 H-2A NPRM and published a final AEWR rule on November 5, 2020. *See* 85 Fed. Reg. 70445 (Nov. 5, 2020).[4] That rule, which went into effect on December 21, 2020, used the OEWS for occupations not surveyed by the FLS but froze the FLS-based AEWRs at the 2020 AEWR rates for two years and adjusted them annually based on the BLS Economic Cost Index, and required payment of the higher wage rate if the job duties encompassed more than one occupation. *Id.* at 70477. Two days after that rule went into effect, it was preliminarily enjoined, and DOL was ordered to continue using the methodology set forth in the 2010 AEWR Rule. *See UFW v. DOL*, 598 F. Supp. 3d 878, 880–81 (E.D. Cal. April 4, 2022). Ultimately, the court vacated the 2020 AEWR Rule.

---

[4]     Meanwhile, litigation challenging the USDA's suspension of the FLS resulted in a preliminary injunction against the suspension, *UFW v. Perdue*, No. 20-cv-01452, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020), followed by a rejection of USDA's motion to modify or dissolve the injunction, *UFW v. Perdue*, No. 20-cv-01452, 2020 WL 6939021 (E.D. Cal. Nov. 25, 2020).

*UFW v. DOL*, 598 F. Supp. 3d at 888. Both the preliminary injunction and the ultimate vacatur turned on "the harm to U.S. farmworkers" based on the two-year freeze and the subsequent linkage to the ECI. *Id.* The court's decision did not implicate the 2020 Rule's use of OEWS-based AEWRs.

### C. The 2021 Notice of Proposed Rulemaking

On December 1, 2021, DOL issued a notice of proposed rulemaking ("NPRM") announcing its intent to amend the regulations governing the methodology to determine the hourly AEWRs for non-range H-2A occupations (*i.e.*, all H-2A occupations other than herding and production of livestock on the range). *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 86 Fed. Reg. 68174 (Dec. 1, 2021). Broadly speaking, the NPRM proposed four main changes to the AEWR methodology. First, DOL proposed to continue to use the FLS as the primary wage source for those occupations surveyed and reported by the FLS. In the event the FLS did not report a wage finding for the field and livestock workers (combined) occupational group (*e.g.*, in Alaska, where FLS does not survey), DOL's BLS Occupational Employment and Wage Statistics

("OEWS") survey—formerly the OES survey prior to March 31, 2021—would serve as a wage source for these occupations. *See id.* at 68179–81.[5]

Second, the NPRM proposed using the occupation-based OEWS to establish the AEWR for those occupations not consistently surveyed by the FLS. *See id.* at 68179 & 68181–83. This OEWS-based AEWR would generally apply to higher paid agricultural positions such as farm supervisors/managers, truck drivers, and those employed for contracted services such as construction or equipment operators supporting farm production. Third, the NPRM proposed to require employers to pay the highest wage applicable if the job opportunity could not be classified within one occupation. For example, if a job opportunity required the same duties as that of a field and livestock worker as well as duties for that of a construction worker, the employer would have to pay the higher rate among those classifications. *See id.* at 68179 & 68183–84. Fourth, the NPRM proposed requiring the Office of Foreign Labor Certification Administrator to publish an update to the FLS AEWRs and OEWS AEWRs as a notice in the *Federal Register* at least once per year. *See id.* at 68179 84.

_____

[5] The following six SOCs correspond to the field and livestock worker occupations where DOL proposed to set the AEWR based on the FLS, or the OEWS if the FLS is not available: (1) Graders and Sorters, Agricultural Products; (2) Agricultural Equipment Operators; (3) Farmworkers and Laborers, Crop, Nursery and Greenhouse; (4) Farmworkers, Farm, Ranch, and Aquacultural Animals; (5) Packers and Packagers, Hand; and (6) Agricultural Workers – Other. *See* 86 Fed. Reg. at 68179. DOL determined only approximately 2% of workers would be employed in H-2A job opportunities where the AEWR will change under the proposed rule from the current baseline. *See* 86 Fed. Reg. at 68188.

*D. The 2023 Rule*

On February 28, 2023, DOL published the 2023 Rule, amending the methodology for determining the AEWR. *See* 88 Fed. Reg. 12760, 12760. After careful consideration of comments from the public, the 2023 Rule adopted the proposals in the 2021 NPRM described above without substantive change, finalizing changes to 20 C.F.R. §§ 655.103(b), 655.120(b)(1), (2), and (5). The 2023 Rule became effective on March 30, 2023.

## II.    Factual and Procedural History

The Plaintiffs commenced this litigation on April 10, 2023. *See* ECF No. 1. On April 26, 2023, Plaintiffs amended their initial complaint. ECF No. 4. On May 24, 2023, Plaintiffs filed a Second Amended Complaint. ECF No. 10. Two days later, Plaintiffs filed a motion for a preliminary injunction. ECF Nos. 12–13. Defendants opposed that motion in due course. *See* ECF No. 17. On July 20, 2023, Plaintiffs moved for an expedited hearing on that motion. *See* ECF No. 34. Defendants opposed that motion four days later. *See* ECF No. 35.

There are 24 Plaintiffs in this case. Twenty-three of them are farm or agri-businesses. *See* Compl. ¶¶ 15–38. The other is USA Farm Labor, Inc. ("USA Farm Labor"), which "is an H-2A agent," which means it "submit[s] H-2A applications on behalf of farms .... submitting over 800 applications annually, most of which cover[] multiple workers." *Id.* ¶ 15. The farm and agri-business Plaintiffs allege that the 2023 Rule "would make it impossible for them to operate profitably, sending their profits

overseas to foreign workers rather than keeping the profits domestically." *Id.* ¶ 39. USA Farm Labor conducted a survey of its clients and, based on the responses, alleges that the 2023 "Rule will reduce [its] income … by $635,800 to $3M annually. The lower figure is assuming that all uncertain farms and survey non-respondents will continue to use the H-2A program. The higher figure is assuming that the survey results represent likely behavior even for those who did not respond to the survey." *Id.* ¶ 48. The Plaintiffs claim that the 2023 Rule is (1) *ultra vires* under the INA, (2) arbitrary and capricious under the APA, and (3) not a product of reasoned decisionmaking, and thus deficient under the APA. *See Id.* ¶¶ 60–91.

## STANDARD OF REVIEW

Under Civil Rule 12(b)(1), a party may seek dismissal based on a court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012).

A challenge to subject-matter jurisdiction under Civil Rule 12(b)(1) may be raised as either a facial or factual attack. *See, e.g., Hutton v. Nat'l Bd. Of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 n.7 (4th Cir. 2018). In a facial attack, where a defendant contends

that a complaint fails to allege facts upon which the Court can base subject-matter jurisdiction, courts must assume as true the factual allegations in the complaint. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). If, however, the defendant makes a factual attack by contending that the jurisdictional allegations contained in the complaint are false, the Court may go beyond the allegations of the complaint in order to determine if the facts support the Court's exercise of jurisdiction over the dispute. *See id.* The burden of establishing subject-matter jurisdiction on a motion to dismiss rests with the plaintiffs. *See id.*; *see also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

## ARGUMENT

### I.     The Farm and Agri-Business Plaintiffs Lack Standing Without Any "Certainly Impending" Harm

As an initial matter, the Plaintiffs asserting standing entirely based on their own harms (*i.e.*, the farms or agribusinesses) have not adequately alleged or shown that they will be injured by the 2023 Rule. Although the farm- and agri-business Plaintiffs may participate in the H-2A program in general, they do not have any current H-2A certifications that will be affected by the 2023 Rule and its use of the OEWS wage rates. *See generally* Barbour Decl. Start with "Plaintiff JCP Farms, LLC, [which] has two current H-2A certifications," but "[n]either is affected by the new Occupational Employment and Wage Statistics (OEWS) wage rates" given the SOC codes that apply to its H-2A applications. *Id.* at ¶ 3. Two other Plaintiffs (Coteau Tiling, Inc. and KD Farm and Ranch) are in functionally the same situation—with two H-2A certifications with

"AEWRs … based on the USDA Farm Labor Survey," meaning that "none of the[ir] current H-2A certifications will be affected by the new OEWS wage rates." *Id.* ¶ 6.

A similar situation exists for Plaintiff SK Farms, Inc., which has a pending H-2A application for a job opportunity that "would [also] … not be affected by the new OEWS wage rates." *Id.* ¶ 4. Twenty Plaintiffs (including SK Farms) have one current H-2A certification, but "the AEWRs for all these current certifications are based on the USDA Farm Labor Survey" and "[t]herefore, none of the[ir] current certifications will be affected by the new OEWS wage rates" that are being challenged by the Plaintiffs here. *Id.* ¶ 5. And there is one Plaintiff (Four R's Ranch, LLC) that "has no pending job orders, no pending H-2A applications, and no current H-2A certifications," and therefore will likewise "not be affected by the new OEWS rates" at the heart of the Plaintiffs' challenge to the 2023 Rule. *Id.* ¶ 7.

This situation is fatal for the farm- and agri-business Plaintiffs because to assert standing for injunctive relief against the 2023 Rule and the H-2A program, they must show a harm that is "certainly impending," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *see also Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) ("[A]n injury should be 'certainly impending' to serve as the basis for standing in a suit for injunctive relief."); *Garcia v. Acosta*, 292 F. Supp. 3d 93, 103–04 (D.D.C. 2019) (dismissing H-2A workers' claims regarding allegedly improper wage-rate calculations where the past season had concluded). Bare statements of intent are not enough. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (A "plaintiff cannot establish standing by

asserting an abstract general interest common to all members of the public." (quotation omitted)). Nor are "[a]llegations of possible future injury." *Whitmore*, 495 U.S. at 158. There must be a real-world harm in the here and now. *See Menders v. Loudon Cnty. Sch. Bd.*, 65 F.4th 157, 163 (4th Cir. 2023) ("We may only resolve real controversies with real impact on real people.").

In other words, "an injury in law is not an injury in fact." *TransUnion*, 141 S. Ct. at 2205. Only an alleged harm that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" is enough to show that a party "has a case or controversy rather than, say, a strong and abiding interest in an issue, or a desire to obtain attorney's fees." *Defenders of Wildlife*, 504 U.S. at 560 (quotations omitted). As the Fourth Circuit has explained, to ignore the requirement of an injury in fact in this case would be to transform constitutional standing into a null item. [Caselaw] requires a concrete and particularized harm to find Article III standing, something greater than 'a bare procedural violation, divorced from any concrete harm.'" *Griffin*, 912 F.3d at 657 (quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)). Without any job orders or H-2A applications that will be treated any differently under the 2023 Rule, the farm- and agribusiness Plaintiffs here are in this precise situation—alleging nothing more than "bare procedural violation[s]," where the day-to-day operations of each company is "divorced from any concrete harm." *Id.* They thus lack Article III standing and should be dismissed from this case.

## II.    USA Farm Labor Also Lacks Standing Because Its Theory of Harm is Entirely Speculative

The only remaining Plaintiff is USA Farm Labor, which is neither a farm nor an agri-business, but an "H-2A agent" that "navigates farmers through the H-2A program's complexities" and "submit[s] H-2A applications on behalf of farms." Compl. ¶ 15. USA Farm Labor describes itself as "among the top three H-2A filing agents nationwide." *Id.* Although not attached to the operative complaint, USA Farm Labor's theories of harm are asserted by Manuel Fick, the company's "President & CEO." ECF No. 13-3 at ¶ 1 ("Fick Affidavit"). Mr. Fick's affidavit states that USA Farm Labor surveyed its customers "about this new rule," and concludes—based on a mere 15.4% response rate—that the 2023 Rule "will increase operating costs for [its] customers by an average of $19,231.25 per month." *Id.* ¶ 5. USA Farm Labor neither submitted nor described the survey. Given the absence of these predicate facts—such as how the survey characterized the 2023 AEWR Rule—there is no basis on which to evaluate the meaning of the responses. Yet, from those responses, which represent only 15.4 percent of those surveyed, USA Farm Labor makes a wide-ranging prediction that, based on certain hypothetical scenarios, the 2023 Rule "will cause extensive harm to [both] our customers and USA Farm Labor, Inc." *Id.*

Thus, USA Farm Labor's assertion of hypothetical harm to its business fails for the same reasons discussed above. Although pocketbook costs may be sufficient to show standing, *see, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023), USA Farm

Labor is not arguing that it has already lost money. Rather, USA Farm Labor merely projects its customers' potential loss of interest in using the H-2A program based on its own undisclosed survey and fuzzy math. *See* Compl. ¶¶ 15 & 48. Even that projection is admittedly based on what USA Farm Labor is "assuming." *Id.* ¶ 48. And underlying USA Labor's assumption is the even larger assumption that the AEWR Rule is the singular determinant of the market for its services. As it stands, no one knows what USA Farm Labor did or did not include within its survey. Nor do we know what procedures were used to conduct such a survey. Nor do we have any idea what specifically was even asked. That is not concretized injury in fact.

If anything, USA Farm Labor's asserted harm is both hypothetical and dependent on the choices of third parties. It therefore runs directly into the principle that "when the plaintiff is not himself the object of the government action or inaction he challenges," causation and redressability are "substantially more difficult to establish." *Defenders of Wildlife*, 504 U.S. at 562 (citation and internal quotation marks omitted). Under such circumstances, standing hinges on the "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* Consequently, and as the Supreme Court recently put it, "[w]hen 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *Texas*, 143 S. Ct. at 1971 (quoting *Defenders of Wildlife*, 504 U.S. at 562).

In *Kowalski v. Tesmer*, for example, the Supreme Court held that attorneys do not have third-party standing to assert the rights of indigent defendants denied appellate counsel, because to do so would be a "short step from the ... grant of third-party standing ... to lawyers ... bring[ing] in court the claims of future unascertained clients[.]" 543 U.S. 125, 134 (2004). The Court noted how a workers' compensation attorney could show their livelihood would be adversely affected by a new regulation curtailing workers' benefits; a medical-malpractice attorney could show their livelihood would be adversely affected by a tort-reform statute; a social security attorney could show that a nonspeculative reduction in their income would result from implementation of a new social-security regulation. *See id.* at 134 n.5. This case falls within that same mold because USA Farm Labor's unsupported belief that it will suffer some degree of monetary harm at some uncertain point is solely based on the speculation of what others *may* do in the future. *See Defenders of Wildlife*, 504 U.S. at 562. That is precisely the sort of abstract disagreement that Article III does not allow to be brought into federal court. *See, e.g.*, *Carney*, 141 S. Ct. at 500–01; *see also Menders*, 65 F.4th at 163 ("Under the Constitution, a party's grievance without an injury in fact does not confer standing[.]"). USA Farm Labor thus fails to adequately allege standing to challenge the 2023 Rule today.

* * * *

In this case, there is *nothing* to establish that any single Plaintiff in this case faces "certainly impending" harm by the 2023 Rule. Nor can the Plaintiffs make any credible allegation of such harm where, as here, none has an application that will be deleteriously

affected by the 2023 Rule. That is fatal to their claim for standing. As it stands, any company that might employ H-2A agricultural workers in the future would be subject to the same 2023 Rule as the Plaintiffs here. Plaintiffs' generic prediction that the 2023 Rule will increase wages for someone, somewhere, does not establish that such an effect will impact the specific Plaintiffs before this Court.

## CONCLUSION

Based on the foregoing, the Court should dismiss this case entirely.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DENA J. KING
United States Attorney

WILLIAM C. PEACHEY
Director

GILL P. BECK (NCSB No. 13175)
Assistant United States Attorney
United States Attorney's Office
Room 233, U.S. Courthouse
100 Otis Street, Room 233
Asheville, NC 28801
Telephone: 828-259-0645
gill.beck@usdoj.gov

GLENN M. GIRDHARRY
Deputy Director

AARON S. GOLDSMITH
*/s/ Joshua S. Press*
JOSHUA S. PRESS (DC Bar No. 1014298)
Senior Litigation Counsel
U.S. Dept. of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-0106
Facsimile: (202) 305-7000
joshua.press@usdoj.gov

Dated: August 4, 2023

*Attorneys for Defendants*