UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| USA FARM LABOR, INC., et al. | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION TO** |
| v. | ) | **DISMISS** |
| | ) | |
| JULIE SU, et al. | ) | |
| | ) | Civil Action No.: 1:23-96 |
| Defendants. | ) | |

## I.  INTRODUCTION

The Court should deny Defendants' motion to dismiss. There is nothing speculative about the injury that Defendants' unlawful regulation visits upon Plaintiffs. Plaintiffs therefore have Article III standing.

## II.  STATEMENT OF FACTS

### A.  The Genesis Of The New Rule

In 2008, the outgoing Bush Administration decided to take a new approach to wage-setting in the H-2A Program. Instead of using an agricultural wage survey, the Department of Labor ("DOL") decided to use the Bureau of Labor Statistics' Occupational Employment Survey ("OEWS") to set the minimum wage rate prospective employers of H-2A workers had to agree to pay. *See Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the*

1

*Labor Certification Process and Enforcement*, 73 Fed. Reg. 77,110, 77,173 (Dec. 18, 2008) ("2008 H-2A Rule").

DOL's experiment with using the OEWS survey for the H-2A program lasted less than five months. On May 29, 2009, DOL suspended the 2008 H-2A Rule, including the use of OEWS wages. *See Temporary Employment of H–2A Aliens in the United States*, 74 Fed. Reg. 24,972 (May 29, 2009) (suspension of rule). DOL published a proposed rule rejecting use of the OEWS survey on September 4, 2009 and finalized it on February 12, 2010. *See Temporary Agricultural Employment of H-2A Aliens in the United States,* 75 Fed. Reg. 6884 (Feb. 12, 2010) (codified, as amended, at 20 C.F.R. pt. B); Temporary Agricultural Employment of H–2A Aliens in the United States, 74 Fed. Reg. 45,906 (Sept. 4, 2009) (proposed rule). DOL reverted to the traditional, well-tested Farm Labor Survey ("FLS") it had long used.

The program methodology was stable from 2010 to 2019. Then DOL decided to tinker with its 2010 H-2A Final Rule methodology. The stated concern motivating this activity was that FLS data might not always be available and so a new data source was needed if that happened. DOL adopted a new methodology in 2020. *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70,445, 70,447–70,465 (Nov. 5, 2020) ("2020 Rule"). However, this rule was

unlawful and was enjoined. *UFW v. United States DOL*, 509 F. Supp. 3d 1225, 1255 (E.D. Cal. 2020).

DOL, however, did not give up. On February 28, 2023, DOL promulgated a "new" regulation that was essentially the same as the enjoined 2020 Rule. *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12,760 (Feb. 28, 2023) ("the Final Rule"). As before, DOL started with the premise that sometimes FLS survey data would not be available and therefore OEWS data was the best alternative. *Id.* at 12,762. DOL then defined availability so that FLS survey data was unavailable if any one of the proposed job duties was included in any occupation for which FLS agricultural wage data was unavailable. *Id.* at 12,802 ("If the job duties on the job order cannot be encompassed within a single occupational classification, the applicable AEWR shall be the highest AEWR for all applicable occupations."); *id.* at 12,779-80 (*passim*). Because DOL's classification system is so general, overlap routinely exists. DOL stated that it intended to target truck driving and to treat normal hauling of commodities as non-agricultural heavy truck driving with a correspondingly higher wage rate. *Id.*

### B. Plaintiffs File This Lawsuit To Set Aside The Final Rule

Plaintiffs are a group of farmers, ranchers, allied agricultural business, and one H-2A agent. In some way, they are all dependent on the H-2A visa program for

3

their livelihoods. *See, e.g.,* Affidavit of Roger T. Haaland, Exh. 14 to Mem. In Supp. of Prelim. Inj., Dkt. 13-15, ¶ 3 ("We have used the H-2A program since 2012. It became a necessity because of the oil field boom, which competed for our supply of workers."); Declaration of Russ Hoggard, Exh. 3 to Mem. In Supp. of Prelim. Inj., Dkt. 13-4, ¶¶ 2-3 ("We can not find enough local help to get the job done.") ("Without the H-2A program we can not continue to farm the number of acres we farm nor can our neighbors because they [resorted] to the H-2A program as well.").

One plaintiff, USA Farm Labor, Inc. ("USAFL"), is in a category of its own. It makes its living by providing services to farmers, ranchers, farm labor contractors, custom harvesters, and allied agricultural businesses who want to access the H-2A visa program but are intimidated by the paperwork and general complications of the process. *See* Exh. 4, Declaration of Manuel Fick, ¶ 2. The Final Rule will have a devastating effect on its business by making the H-2A visa program prohibitively expensive. *Id.* at ¶ 5.

Plaintiffs filed this lawsuit on April 10, 2023. As more people wanted to join the suit, a first and then Second Amended Complaint was filed. Dkt. 4, 10. Plaintiffs filed a Motion For A Preliminary Injunction. Dkt. 12. Defendants opposed this motion on several grounds, including the claim that Plaintiffs were not impacted by the Final Rule. Dkt. 17 at 19-20. Only after that briefing was complete did Defendants assert that this Court lacked subject matter jurisdiction based on the

4

claim that Plaintiffs were not impacted by the Final Rule. Plaintiffs now file this opposition.

## III. ARGUMENT

### A. Legal Principles Governing Motions To Dismiss Based On Federal Rule Of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to raise the defense of "lack of subject matter jurisdiction" by motion. *See* Fed. R. Civ. P. 12(b)(1). For a federal court to have subject matter jurisdiction, the matter must fall within the broad jurisdiction authorized by Article III of the Constitution and within the narrower statutory authorization provided by Congress.

To establish standing under Article III, "a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769 (2008). This "real, immediate, and direct" test is satisfied when a party "demonstrate[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979). Nothing more is required. *Id.* ("But [one] does not have to await the consummation of threatened injury to obtain preventive relief. If the injury

is certainly impending that is enough.") (citation omitted); *see also Davis*, 554 U.S. at 734.

A party invoking federal jurisdiction must also show that the matter has a statutory basis for federal jurisdiction. In this case, it is undisputed that 28 U.S.C. § 1331 provides the statutory basis for jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977).

Challenges to subject matter jurisdiction are either facial or factual. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (discussing difference between "facial" and "factual" attacks). "Factual attacks, . . . challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (citation and quotation marks omitted). Defendants' challenge appears to be factual in light of their submission of an affidavit and citations to non-complaint materials.

Finally, "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute, . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 160-61 (4th Cir. 2016) ("If disputed facts are 'inextricably intertwined' with the facts underlying the merits of the plaintiffs' claims, the district court should resolve these disputed jurisdictional facts along with the intertwined merits issues.").

6

## B. Plaintiffs Satisfy The Requirements For Article III Standing

As prospective H-2A program participants, Plaintiffs will have to offer and pay an adverse effect wage rate calculated by the unlawful methodology at hand. 20 C.F.R. § 655.120(a). Not only is there a "realistic danger" of being forced to pay an unlawfully high wage or otherwise sustain harm resulting from the unlawful regulation, *Babbitt*, 442 U.S. at 298, there is a virtual certainty of that happening.

### 1. Plaintiff Farmers And Ranchers Face A "Realistic Danger" Of Sustaining An Injury In Fact If The Rule Is Not Enjoined

The H-2A visa program is an essential and effective lifeline for Plaintiff farmers and ranchers. *See, e.g.* Declaration of Russ Hoggard, Exh. 3 to Mem. In Supp. of Prelim. Inj., Dkt. 13-4, ¶ 9 ("We can't farm the number of acres without H2A workers. We can't go back to the 90-100 hour work weeks and miss everything … if this changes goes through along with the other increased expenses we are facing we may be forced to cut back or quit farming altogether."); Declaration of John Petron, Exh. 7 to Mem. In Supp. of Prelim. Inj., Dkt. 13-8, ¶ 3 ("The H-2A employees have become extremely critical to our farm over the last two years as domestic workers have become so scarce."); Declaration of Lynnette "Bo" Young, Exh. 6 to Mem. In Supp. of Prelim. Inj., Dkt. 13-7, ¶ 4 ("[w]e depend heavily on the H-2A program to furnish the extra employee so we can effectively harvest crops in a timely manner.") The key to their access is the cost of the terms and conditions that the regulations require them to provide. *See* 20 C.F.R. §§ 655.120 (wage

requirements); 655.122(a)-(q) (non-wage terms and conditions). Any change to these items carries with it a cost that applies to each Plaintiff by direct operation of the regulation. *See, e.g.,* Declaration of John Petron, Exh. 7 to Mem. In Supp. of Prelim. Inj., Dkt. 13-8, ¶ 6 ("Some of the new wage rates would nearly double what we were paying H2A workers in 2021.").

Moreover, as to wages, the change can apply retroactively. The regulations state that the employer must pay the adverse effect wage rate in effect at the time that the H-2A work is performed. *See* 20 C.F.R. § 655.121(l). For example, assume that DOL requires an employer to pay $17.33 per hour (the AEWR in effect at the time of certification) but the AEWR goes up to $30.56 per hour at the time the work is performed, the employer would have to pay the higher rate upon notice.

The regulation will have a direct impact on Plaintiffs and there is a realistic danger of such injury. Each Plaintiff explains that the Final Rule will significantly and unaffordably increase their H-2A wage costs. *See, e.g.*, Declaration of Lynnette "Bo" Young, Exh. 6 to Mem. In Supp. of Prelim. Inj., Dkt. 13-7, ¶ 10 ("Between paying government fees, providing free housing and utilities and providing a vehicle, that annual cost runs each farm, per H2A worker right around $15,000.00 a year. Add the AEWR pay rate in Nebraska of $17.33/hour times an average work week of 60-65 hours, equals $58,575.40 salary + $15,000.00 fee's + workman's comp $3,496.04 you are at an annual compensation of $77,071.44."). The increased costs

are, standing alone, injury in fact as "[e]ven one dollar's worth of harm is traditionally enough to "qualify as concrete injur[y] under Article III." *United States v. Texas*, 143 S. Ct. 1964, 1977 (2023) (Gorsuch, J., concurring). This is why even amici curiae, who support the government, state that "Plaintiffs' theory of irreparable harm and scope of relief are relatively straightforward" as to Plaintiff farms, ranches, and allied agricultural businesses. Mem. of Amici in Opp. to Mot. for Prelim. Inj., Dkt. 30 at 11.

Defendants' arguments to the contrary do not undermine standing. First, Defendants' authority comes from standing challenges that have little or nothing to do with the circumstances before the Court. *Whitmore v. Arkansas*, 495 U.S. 149, 110 S. Ct. 1717 (1990), is a third-party standing case which decided that one death row inmate could not challenge a death penalty imposed on another. *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649 (4th Cir. 2019), involved a "dignitary interest" in obtaining information about somebody else. *Garcia v. Acosta*, 393 F. Supp. 3d 93 (D.D.C. 2019), involved mootness of so-called challenges to "wrongful certification." Finally, *Carney v. Adams*, 141 S. Ct. 493 (2020), involved a challenge to a state constitutional provision that did not apply to the plaintiff. None of these cases discussed, much less evinced, an intention to reconsider the "realistic danger" test articulated in *Babbit*. By that standard, Plaintiff's certainly have standing.

9

Case 1:23-cv-00096-MR-WCM   Document 44   Filed 09/01/23   Page 9 of 16

Defendants advance another argument. They contend that there is no realistic danger that Plaintiffs will be subject to the Final Rule now or in the future because Defendants have not applied the Final Rule to the vast majority of applications.[1] While Plaintiffs certainly appreciate that even Defendants may be unwilling to apply the Final Rule, that makes no difference. Defendants' voluntary cessation of their unlawful activity (*i.e.*, implementing the unlawful Final Rule) "does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (citation omitted). The Court can be sure that the way Defendants are applying the rule will not continue as they are vigorously opposing Plaintiffs' efforts for this Court to enter an order requiring them to do what they claim removes the realistic danger that Plaintiffs face.

Defendants also argue that any danger is months away and so is not certain. Defendants imply that a suit needs to be brought within a certain amount of time before standing exists. Mem. in Supp. of Mot. to Dismiss, Dkt. 38 at 13-14. However, Defendants cite no such cases. *Babbit* and *Davis* require a "realistic danger." Here, the danger comes from Defendants determination to apply the

---

[1] Declaration of Shane Barbour, Dkt. 38-1, ¶ 9. Mr. Barbour minimizes the impact of the Final Rule. He states that 96.7% of job orders adjudicated since March 30, 2023 received a wage based on the Farm Labor Survey. But this would include many applications that were submitted before March 30, 2023, were still pending on that date, and therefore were adjudicated under the prior rule. Final Rule, 88 Fed. Reg. at 12,802 ("The [new methodology] shall apply to all job orders submitted...on or after March 30, 2023."). Mr. Barbour's statistic includes applications processed under the old rule and the Final Rule, so it is meaningless as a measurement of the Final Rule's impact.

10
Case 1:23-cv-00096-MR-WCM   Document 44   Filed 09/01/23   Page 10 of 16

unlawful rule.[2] And since the unlawful rule applies directly to Plaintiffs, they remain in danger from it until and unless it is enjoined and/or vacated.

Because Plaintiffs face a realistic danger from the Final Rule, all of them have standing. *Babbitt*, 442 U.S. at 298.

### 2. Plaintiff Four R's Ranch Faces Immediate Danger Of Having Defendants' Unlawful Rule Applied To It

Most Plaintiffs will be filing applications in November/December 2023 for spring 2024 start dates. *See* Exh. 4, Declaration of Manuel Fick, ¶ 8. This schedule is dictated by 20 C.F.R. § 655.121(b) which permits filing no more than 75 days before an employer's date of need and no less than 60 days.

One employer, Plaintiff Four R's Ranch, has a date of need of December 1, 2023 for the services of four (4) Truck Drivers. That means it will file its H-2A application around September 17, 2023 – or about 16 days from now. *See* Exh. 1, Supplemental Declaration of Scott Schiff, ¶). No matter what Defendants' magic window for seeking prospective relief from an unlawful regulation is, sixteen days is certainly within it.

---

[2] If Defendants do not apply the unlawful rule, it is anybody's guess as to what rule they will apply. Whatever rule they apply in its place would be the very definition of arbitrary and capricious and therefore unlawful too.

### 3. Plaintiff USA Farm Labor, Inc. Has Standing Due To The Loss Of Its Customers Under The New Rule

"[T]he Fourth Circuit has repeatedly recognized that [t]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of irreparable harm." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985) ("Merrill Lynch faced irreparable, noncompensable harm in the loss of its customers."); *Dynamic Aviation Grp., Inc. v. Dynamic Int'l Airways*, No. 5:15-CV-00058, 2016 U.S. Dist. LEXIS 39248, at *89 (W.D. Va. Mar. 24, 2016) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.") Even "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC*, 918 F.3d at 366; *see also Feinerman v. Bernardi*, 558 F.Supp.2d 36, 51 (D.D.C. 2008).

Similarly, when courts have applied standing principles to companies in Plaintiff USA Farm Labor's circumstances, they have found standing. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 545 (N.D. Cal. 2020). In *Immigrant Legal Res. Ctr.*, a district court in California enjoined an increase in application fees for immigration benefits. The injunction was granted to immigration

service providers who assisted people in applying for benefits, and whose revenue stream would be threatened if fewer people applied for benefits. Plaintiff USA Farm Labor is in the exact same position.

Defendants argue that Plaintiff USA Farm Labor has not lost any clients or money due to the new rule. They are wrong. *See* Exh. 4, Declaration of Manuel Fick, ¶ 16 (stating losses to date). These losses are attributable to the Final Rule. *Id.*

Plaintiff USA Farm Labor expects these losses to mount. 60% of USA Farm Labor's clients expressed their intention to stop using the H-2A program if the Final Rule is applied to them. Fick Decl. ¶ 9. The high filing season is coming up. *See* Fick Decl., ¶¶ 6, 8, 9. This is when most of its customers have to decide whether to continue with the H-2A program or not. If they do, they will subject themselves directly to the unlawful rule, Fick Decl., ¶¶ 6, 8, or they will stop being Plaintiff USA Farm Labor's customers and USA Farm Labor will be irreparably injured. *See* Fick Decl., ¶ 6, 8, 9, 15.

Plaintiff USA Farm Labor's expectation of substantial losses – of more than $1.7 million – derives from surveys it conducted. Defendants complain that Plaintiff USA Farm Labor did not provide the instruments. Mem. in Supp. of Mot. to Dismiss, Dkt. 38 at 15. They are attached to the Fick Declaration. Defendants complain about the response rate, but it was entirely adequate to be statistically valuable. Clearinghouse for Military Family Readiness, "Survey Response Rates: Rapid

13
Case 1:23-cv-00096-MR-WCM   Document 44   Filed 09/01/23   Page 13 of 16

Literature Review" 3, Feb. 7, 2019, https://militaryfamilies.psu.edu/wp-content/uploads/2019/12/Survey_Response_Rates.pdf ("Average survey response rates can range from 10-15% for external surveys to 54% for in person surveys."). Defendants' nitpicking cannot change the underlying realities that (1) Plaintiff USA Farm Labor has *already* lost customers due to the Final Rule and (2) by making the H-2A program unaffordable, a business that serves people who want to participate in the H-2A program will hemorrhage customers. The law of supply and demand guarantees it.

### C. Defendants' Motion Should Be Consolidated With A Decision On The Merits

Defendants opposed Plaintiffs' Motion for a Preliminary Injunction by arguing, among other things, that Plaintiffs had not and would not experience any harm, imminent or otherwise. They used the same technique – submitting a declaration from Shane Barbour with the implicit promise that Plaintiffs would not suffer any injury since Defendants were not applying their unlawful rule to other employers. They even repeated some parts of the merits opposition verbatim in the this motion.

This is not surprising because, as Defendants have framed the issue, the merits of Plaintiffs' claim for relief and standing are inextricably intertwined. However, the Fourth Circuit has held that factual attacks on subject matter jurisdiction under Rule 12(b)(1) that are intertwined with the merits are to be resolved with the merits. *Tyree*

*v. United States*, 814 F. App'x 762 (4th Cir. 2020); *Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982). A decision on Defendants' motion should be consolidated with a hearing on the merits.

## IV. CONCLUSION

To have standing to challenge Defendants' unlawful regulation, Plaintiff need only demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308 (1979). Plaintiffs easily satisfy this test. Each Plaintiff depends on access to the H-2A program. Defendants, through their unlawful rule, directly threaten to inflict irreparable injury on each Plaintiff. Plaintiff USA Farm Labor has already lost clients and expects to lose approximately $1.7 million dollars in customers and revenue. This Court unquestionably has subject matter jurisdiction to hear this dispute. The Court should deny Defendants' motion to dismiss.

Dated: September 1, 2023

/s/ Mark Stevens
Mark Stevens, VA Bar # 86247
Clark Hill PLC
1001 Pennsylvania Ave. NW, Suite 1300 South
Washington, DC 20004
Telephone: (202) 552-2358
Facsimile: (202) 772-0919
mstevens@clarkhill.com

Wendel V. Hall
Hall Global
1350 Connecticut Ave, N.W., Suite 1220
Washington, DC 20036
Telephone: 202-744-3250
wendel@halllawoffice.net

Patrick H. Flanagan, NC Bar # 17407
Cranfill Sumner LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
phf@cshlaw.com

*Counsel for Plaintiffs*