**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:23-cv-00096-MR-WCM**

| | | |
|---|---|---|
| **USA FARM LABOR, INC. et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **JULIE SU, Acting** | ) | |
| **Secretary of Labor, U.S.** | ) | |
| **Department of Labor, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiffs' Motion for Preliminary Injunction [Doc. 12]; the Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. 37]; and the Plaintiffs' Motion for Temporary Restraining Order [Doc. 46].

## I.    PROCEDURAL BACKGROUND

On April 10, 2023, Plaintiffs USA Farm Labor, Inc.; JCP Farms, LLC; Lazy BS Bar, Inc.; B&B Agri Sales, LLC; Hoggard Farms; Masching Agriculture, LLC; Hutto Grain; KD Farm & Ranch; Circle D Farms; Triple T Farms, Inc.; Bebb Farms; and Jamerson Farms (collectively, "Plaintiffs") filed the present suit pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., against Julie Su, Acting Secretary of Labor; Brent

Parton, Acting Assistant Secretary of Labor; and Brian Pasternak, Administrator of the Office of Foreign Labor Certification in the United States Department of Labor (collectively, "Defendants") in their official capacities. [Doc. 1]. The Plaintiffs challenge a new Final Rule ("the Final Rule") published by the United States Department of Labor ("DOL" or "the Agency") on February 28, 2023, announcing a change in the methodology the Agency will use to set the Adverse Effect Wage Rate ("AEWR") for the H-2A agricultural worker visa program. [Id.]. On April 26, 2023, the Plaintiffs filed an Amended Complaint containing identical allegations but naming five additional plaintiffs: Bruce Young Farms; SK Farms Inc.; Kaup Produce, Inc., Coteau Tiling, Inc.; and Haaland Grain Farms. [Doc. 4]. On May 24, 2023, the Plaintiffs filed a Second Amended Complaint also containing identical allegations but naming an additional seven plaintiffs: J D Layman Farms Inc.; Molitor Brothers Farm; Four R's Ranch LLC; Lincoln County Feed Yard LLC; CDC, Inc.; Grand Farming Enterprises, Inc.; and Wright Farms of Butler Co Inc. [Doc. 10].

On May 26, 2023, the Plaintiffs filed the present Motion for Preliminary Injunction requesting that this Court enjoin the Defendants from applying the Final Rule to "any H-2A job order submitted by or on behalf of plaintiffs." [Doc. 12]. On June 12, 2023, the Defendants filed a Response in Opposition

to the Plaintiffs' Motion for Preliminary Injunction. [Doc. 17]. On June 20, 2023, the Plaintiffs filed a Reply to the Defendants' Response in Opposition. [Doc. 23].

On June 9, 2023, James Simpson, Stephanus De Klerk, and Farmworker Justice (collectively, "Amici"), filed a Motion for Leave to File Brief as Amici Curiae in Support of Defendants' Opposition to Motion for a Preliminary Injunction. [Doc. 14]. The Court granted that request via text order on June 28, 2023, and Amici filed their Brief of Amici Curiae in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction on the same day. [Doc. 30].

On July 20, 2023, the Plaintiffs filed a Motion to Expedite a Hearing on their Motion for Preliminary Injunction. [Doc. 34].

On August 4, 2023, the Defendants filed a Motion to Dismiss the Plaintiffs' Second Amended Complaint for lack of standing. [Doc. 37]. In light of the jurisdictional issue raised by the Defendants' Motion, the Court denied the Plaintiffs' request for an expedited hearing on the preliminary injunction issue and held that motion in abeyance pending resolution of the motion to dismiss. [Text-Only Order entered Aug. 8, 2023]. After receiving an extension of time to do so [Text-Only Order entered Aug. 18, 2023], the Plaintiffs filed a Response to the Defendants' Motion to Dismiss on

3

September 1, 2023. [Doc. 44]. The Defendants filed their Reply on September 13, 2023. [Doc. 45].

On September 20, 2023, the Plaintiffs filed a Motion for Temporary Restraining Order, seeking to enjoin the Defendant apply the Final Rule to "any H-2A job order submitted by or on behalf of Plaintiffs Four R's Ranch LLC and USA Farm Labor." [Doc. 46]. The Court ordered an expedited response from the Defendants, which was filed on September 22, 2023. [Doc. 48]. The Plaintiffs filed a reply on September 25, 2023. [Doc. 49].

Thus, this matter has been fully briefed and is ripe for disposition.

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss for Lack of Standing

Because standing is an element of subject matter jurisdiction, a motion to dismiss for lack of standing is properly analyzed under Federal Rule of Civil Procedure 12(b)(1). See Pitt County v. Hotels.com, L.P., 553 F.3d 308, 311 (4th Cir. 2009). The Plaintiff bears the burden of proving that subject matter jurisdiction exists. United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir. 2009). The Court should grant a motion to dismiss for lack of subject matter jurisdiction only "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d

4

765, 768 (4th Cir. 1991). In making this determination, the Court should "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Id.

## B. Injunctive Relief

A plaintiff seeking interim injunctive relief, either through temporary restraining order or a preliminary injunction, must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of the equities tips in its favor, and (4) the injunction would be in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." Id. at 24. A plaintiff seeking a preliminary injunction "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted). Ultimately, a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

5

## III.    FACTUAL BACKGROUND

### A.    The H-2A Visa Program and the AEWR

This case involves changes to the H-2A visa program, which allows U.S. agricultural employers to hire foreign workers to perform temporary agricultural labor or services.  See 8 U.S.C. § 1101(a)(15)(H)(ii)(a).  The modern H-2A program has its roots in the H-2 program, created in 1952 when Congress passed the Immigration and Nationality Act ("INA").  Immigration and Nationality Act, ch. 477, 66 Stat. 163 (1952).  The INA provided that, after consultation with "appropriate agencies," the Attorney General could issue a temporary visa to a nonresident alien "who is coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country."  Id. at §§ 1101(a)(15)(H)(ii), 214(c), 66 Stat. at 168, 189; AFL-CIO v. Brock, 835 F.2d 912, 913 (D.C. Cir. 1987) (summarizing the origins of the H-2A program).

After the INA was enacted, the Attorney General promulgated regulations providing that an H-2 worker's visa could be immediately revoked upon "[d]etermination and notification by the Secretary of Labor that sufficient domestic workers who are able, willing, and qualified are available at the time and place needed to perform the work for which such workers are

6

employed, or that the employment of such workers is adversely affecting the wages and working conditions of domestic agricultural workers similarly employed, or that reasonable efforts have not been made to attract domestic workers for such employment at wages and standard hours of work comparable to those offered to foreign workers."  8 C.F.R. § 475.2(c)(3) (1953).  In 1968, the Attorney General promulgated regulations requiring that a petition for an H-2 visa must be accompanied either by "a certification from the Secretary of Labor or his designated representative stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United states similarly employed, or a notice that such a certification cannot be made."  8 C.F.R. § 214.2(h) (1968)

In 1986, Congress passed the Immigration Reform and Control Act ("IRCA"), creating a new "H-2A" classification[1] for nonresident aliens admitted to perform temporary agricultural[2] work.  Immigration Reform and

---

[1] Nonresident aliens admitted to perform temporary nonagricultural work now fall under the "H-2B" program. See 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

[2] Today, an agricultural worker covered by the H-2A program is defined as a worker coming to the United States "to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

Control Act of 1986, § 301, 100 Stat. 3359, 3411. As relevant here, the IRCA codified the certification process for H-2A visas, conditioning the Attorney General's approval of an H-2A worker's visa on the Secretary of Labor's certification that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

Id. § 216, 100 Stat. at 3411 (codified as amended at 8 U.S.C. § 1188(a)(1)). Accordingly, the DOL must ensure that domestic workers wages' and working conditions will not be adversely affected before it can issue an H-2A certification.

In part, the DOL complies with its duties to ensure that domestic workers are not adversely affected by temporary foreign labor by setting the hourly Adverse Effect Wage Rate (AEWR). See Brock, 835 F.2d at 914. To prevent the wage depressive effects of an influx of less expensive foreign labor, H-2A employers are prohibited from paying both foreign and domestic workers less than the AEWR. Id. at 913. The AEWR is meant "to approximate the rates that would have existed had there been no increase

8

in labor supply from foreign labor"; accordingly, if domestic workers do not apply for positions paying the AEWR, then the Agency concludes that sufficient domestic labor is unavailable and an employer may hire foreign workers instead, paying those workers the AEWR. Id.

The method by which the Agency calculates the AEWR has changed several times since it initially set the AEWR in 1963.[3]  From 1963 to 1964, the DOL set the AEWR using the average hourly earnings for each state as measured by the 1959 Census of Agriculture, "adjusted by the 1959-61 trend in wages as determined by the USDA." Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology, 54 Fed. Reg. 28037, 28040 (July 5, 1989). In 1964, the DOL modified its AEWR methodology and announced that beginning in 1965, it would calculate the AEWR by using the 1950 Census of Agriculture averages for each state, "adjusted by the 1950-63 trend in gross average hourly earnings of production workers in manufacturing[4] or the 1950 Census of Agriculture national AHFW rate

_____

[3] Prior to 1963, H-2 employers were required only to pay "prevailing wages."  Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology, 54 Fed. Reg. 28037, 28040 (July 5, 1989).

[4] In reviewing a challenge to the 1989 change to the DOL's AEWR calculation methodology, the D.C. Circuit noted that the DOL adjusted the 1950 agricultural wage

9

similarly adjusted, whichever was higher." Id. In 1968, the Agency again changed course, setting the AEWR by "adjusting the previous year's Statewide AEWR by the same percentage as the percentage change in the Statewide annual average wage rates for field and livestock workers, as surveyed by the USDA." Id.

After the IRCA was enacted, the DOL again changed its methodology and in 1987 promulgated regulations setting the AEWR for each year "at a level equal to the previous year's annual regional average hourly wage rates for field and livestock workers (combined), as computed by the USDA quarterly wage surveys." Id. at 28038. The DOL used that methodology until 2008, when it began using the Occupational Employment Statistics survey ("OES survey"), administered by the Bureau of Labor Statistics ("BLS"), rather than the USDA farm labor survey ("FLS"), to set the AEWR. Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement, 73 Fed. Reg. 77110, 77173 (Dec. 18, 2008). The DOL suspended its use of the OES survey data soon after, however, and in 2010 resumed using the FLS to set the AEWR. Temporary Employment of H-2A Aliens in the United States, 74

---

averages by manufacturing rate changes "on the theory that farm wages had stagnated because of the enormous influx of Mexican workers between 1951 and 1964." Brock, 835 F.2d at 914.

Fed. Reg. 25972, 25972 (May 29, 2009) (suspending calculating the AEWR using OES data); Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) (announcing the continued use of FLS data to calculate the AEWR).

In 2019, the DOL published a proposed rule whereby it would modify the AEWR-setting methodology to achieve an "occupation-based wage" ("the 2019 Proposed Rule"). Temporary Agricultural Employment of H-2A Nonimmigrants in the United States, 84 Fed. Reg. 36168, 36171 (July 26, 2019). Specifically, the 2019 Proposed Rule would continue to use the FLS to set the AEWR but establishing separate AEWRs for distinct agricultural occupations within a state or region. Id. Where the FLS did not report data within a state or region for a particular occupation, the 2019 Proposed Rule would use OES survey data to set the AEWR. Id. The DOL justified this occupation-based methodology, and the use of OES survey data to set the AEWR for some occupations, by explaining its concerns that continuing to use a more generalized approach to set the AEWR "could produce a wage rate that is not sufficiently tailored to the wage necessary to protect against adverse effect." Id.

On November 5, 2020, the DOL published a final rule ("the 2020 Final Rule") adopting the 2019 Proposed Rule's use of OES survey data to set the

11

AEWR for some occupations. Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 85 Fed. Reg. 70445, 70446 (Nov. 5, 2020). However, the 2020 Final Rule adopted a new methodology for setting the AEWR in field- and livestock-worker occupations. Id. Specifically, the 2020 Final Rule announced that the DOL would set the AEWR for field- and livestock-worker occupations by using 2019 FLS data to set a baseline wage rate for field- and livestock- worker occupations and would adjust yearly using the Employment Cost Index ("ECI"), a measure of the rate of change in employee compensation calculated by the FLS. Id. The 2020 Final Rule further announced that it would not implement the new AEWR methodology until 2023. Id. Instead, it would freeze the AEWR for two years at the 2020 rates (calculated using 2019 FLS data). Id. The DOL cited concerns about whether the FLS data would be available in future years to justify the freeze and the use of the ECI to adjust the AEWR in field- and livestock-worker occupations.[5] Id.

_____

[5] In part, these concerns were based on the USDA's announcement in 2020 that it had suspended FLS data collection and would not be publishing the FLS that year. United Farm Workers v. U.S. Dep't of Lab., 509 F.Supp.3d 1225, 1232-33 (E.D. Cal. 2020). That suspension was enjoined and the USDA was ordered to collect FLS data that year; however, the 2020 Final Rule noted continuing "uncertainty" regarding the longer-term future of the FLS. 85 Fed. Reg. at 70446.

The 2020 Final Rule was subsequently challenged and enjoined from enforcement as arbitrary and capricious in United Farm Workers v. U.S. Department of Labor, 509 F. Supp. 3d 1225 (E.D. Cal. 2020). The court in that case held that the plaintiffs had demonstrated a likelihood of success on the merits of their arguments that DOL had failed to adequately explain its reasoning for adopting a two-year freeze of AEWR rates, had failed to explain how the 2020 Final Rule adequately protected domestic field- and livestock-workers[6] against adverse effects, and had failed to analyze economic harm to domestic farmworkers. Id. at 1237-45. The 2020 Final Rule was later vacated on the same grounds as the injunction. United Farm Workers v. U.S. Dep't of Lab., 598 F.Supp.3d 878, 887-88 (E.D. Cal. 2022).

### B. The February 2023 Final Rule

On December 1, 2021, the DOL issued a notice of proposed rulemaking, again announcing that it intended to modify the methodology used to set AEWRs. Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 86 Fed. Reg. 68174 (Dec. 1, 2021). This rule proposed using a combination of FLS data and Occupational Employment and Wage

---

[6] The court noted that while the 2020 Final Rule benefitted higher-skilled workers, it "slightly lower[ed] wages" for field- and livestock-workers. 509 F.Supp.3d at 1239.

Statistics ("OEWS") survey[7] data to set the AEWRs. Id. at 68175. Specifically, the Agency proposed using FLS data to set the AEWR for the "vast majority of H-2A job opportunities represented by six[8] occupations comprising the field and livestock worker (combined) category within the FLS." Id. at 68179. For those six occupations, in circumstances where "FLS wage data is unavailable or insufficient to generate a State or regional wage finding," the rule proposed using OEWS data to set the AEWR. Id.

For job opportunities that do not fall within the FLS field- and livestock-workers category, the rule proposed adopting an "OEWS-based, occupation-specific AEWR methodology."[9] Id. at 68181. Under the proposed methodology, "the AEWR for all occupations other than field and livestock workers will be the statewide annual average hourly wage for the occupational classification, as reported by the OEWS survey." Id. To determine to which classification a particular job opportunity belongs, the

---

[7] The OEWS survey was formerly the OES survey.

[8] These six occupations are those with the following Standard Occupational Classification ("SOC") titles and codes: "Farmworkers and Laborers, Crop, Nursery and Greenhouse Workers (45– 2092); Farmworkers, Farm, Ranch, and Aquacultural Animals (45–2093); Agricultural Equipment Operators (45– 2091); Packers and Packagers, Hand (53–7064); Graders and Sorters, Agricultural Products (45–2041); and All Other Agricultural Workers (45– 2099)." 86 Fed. Reg. at 68179.

[9] This methodology was first proposed in the 2019 Proposed Rule and adopted by the now-vacated 2020 Final Rule. However, as explained above, the occupation-based methodology was not the reason for the vacatur.

certifying officer ("CO") at the DOL reviewing the H-2A petition will consider "the totality of the information in an H-2A application and job order" and will "compare the duties of the employer's job opportunity with the [Standard Occupational Classification ("SOC")] definitions and tasks that are listed in the Department's Occupational Information Network. . . . In the event the job opportunity cannot be classified within a single SOC, the CO will assign a combination of occupations—more than one SOC code—to the employer's job opportunity." Id. at 68183. For job opportunities assigned a combination of occupations, H-2A employers would be required to pay the "highest applicable wage." Id. at 68181, 68183.

Following a notice and comment period, on February 28, 2023, the DOL published the 2023 Final Rule without substantive change. Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 88 Fed. Reg. 12760 (Feb. 28, 2023). The rule went into effect on March 30, 2023. Id. This lawsuit followed.

### C.    The Plaintiffs

The Plaintiff USA Farm Labor, Inc. ("USA Farm Labor") is headquartered in Waynesville, North Carolina, and serves as an H-2A agent that submits over eight hundred H-2A applications annually, most of which

15

cover multiple workers, on behalf of farms and agri-businesses throughout the nation. [Doc. 10 at 7, ¶ 15]. The other Plaintiffs ("the Farm Plaintiffs") are farms and agri-businesses located throughout the United States which hire foreign workers through the H-2A program. [Doc. 10 at 9, ¶ 39].[10]

## IV. DISCUSSION

### A. Standing

Article III of the United States Constitution limits federal courts' jurisdiction to actual "cases" or "controversies." See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). As the Supreme Court has explained, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction has the burden of establishing standing. Id. at 561.

The doctrine of standing is intended "to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate ...." Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 319 (4th Cir. 2002). In order to satisfy Article III's standing

---

[10] The Second Amended Complaint includes two sets of paragraphs numbered 39-51. For clarity, the Court will specify both the page number and paragraph number when it refers to the Second Amended Complaint.

16

requirement, a plaintiff must demonstrate that: (1) plaintiff suffered an injury in fact; (2) that the injury suffered is "fairly traceable" to the challenged actions of the defendant; and (3) that it is likely, rather than just speculative, that the plaintiff's alleged injury will be redressed by a favorable decision by the Court. Defenders of Wildlife, 504 U.S. at 560-61.

To establish injury in fact, a plaintiff must demonstrate that it has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 560. At the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." Id. at 561 (citation and internal quotation marks omitted).

Here, the Defendants argue that the Farm Plaintiffs do not have any current labor certifications or pending H-2A applications that are or will be affected by the 2023 Final Rule, nor have they alleged that they intend to submit such applications that will be affected by the 2023 Final Rule. Without

any ongoing or imminent injury, the Defendants argue, the Farm Plaintiffs lack standing to pursue their claims. [Doc. 38 at 7, 7-19].

To the extent that some Farm Plaintiffs currently no applications or certifications pending, such fact is not fatal to these Plaintiffs' claims.[11] "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). "[O]ne does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending that is enough." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (citation and internal quotation marks omitted).

Here, the Plaintiffs have alleged that their injury is certainly impending. The Farm Plaintiffs have offered declarations explaining their reliance on the H-2A program and how implementation of the Final Rule will significantly and detrimentally increase their H-2A wage costs. [See Docs. 13-4 through 13-15]. Some of the Farm Plaintiffs state that the Final Rule would make their

---

[11] In support of their motion, the Defendants submit the Declaration of Shane Barbour, the Center Director at the DOL Office of Foreign Labor Certification's Chicago National Processing Center. [Doc. 38-1]. Mr. Barbour states in his Declaration, among other things, that of the Farm Plaintiffs that have current H-2A certifications or applications, none would be affected by the new OEWS wage rates. [Id. at ¶¶ 3-6]. Mr. Barbour's Declaration, however, is only electronically signed and is neither notarized nor executed under penalty of perjury. As such, the Court will disregard this Declaration.

18

use of H-2A workers cost-prohibitive [see, e.g., Doc. 13-6: Layman Aff. at ¶ 6 (explaining that the new rule would "likely eliminate [his] ability to use H2A, and would ultimately see [him] rolling back [his] organic crop farm by 75%")], while others affirmatively state their plans to file H-2A applications, despite the wage increases, in advance of their date of need [see, e.g., Doc. 44-1: Schiff Supp. Decl. at ¶¶ 2, 3 (indicating an intent to file an application in advance of 12/1/23 date of need)].

With respect to USA Farm Labor, the Defendants contend that its theory of harm—that it will lose customers whose operating costs will be significantly raised by the Final Rule—is entirely speculative and cannot serve to establish standing. [Id. at 20-22].

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Defenders of Wildlife, 504 U.S. at 562 (citation and internal quotation marks omitted). Here, it appears that USA Farm Labor has met this heightened burden. USA Farm Labor asserts that it has already suffered injury, both in the form of lost revenue and lost customers, as a result of the new rule. [See Doc. 44-4: Fick Decl. at ¶ 16]. It anticipates even greater losses in the future, as the new rule will increase operating costs for its customers, resulting in fewer customers using USA

19

Farm Labor to process H-2A applications.  [Id. at ¶ 6].  USA Farm Labor's expectation of substantial losses is further confirmed by customer surveys[12] indicating that the vast majority of their current customers hire workers to perform tasks singled out by the new AEWR methodology rule for occupation code reassignment.  [See id.].

In sum, the Court finds that the Plaintiffs have sufficiently established their standing to assert their APA claims.  Accordingly, the Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

## B.    Request for Preliminary Injunctive Relief

### 1.    Likelihood of Success on the Merits

The APA requires the Court, in pertinent part, to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  Here, the Plaintiffs argue that they are likely to succeed on the merits of their APA claims that DOL exceeded its statutory authority by considering "non-agricultural" wage data

---

[12] The Plaintiffs did not initially attach these surveys to their response to the Defendants' Motion to Dismiss but have provided them in moving for a temporary restraining order. [See Doc. 47-6: Ex. 2].

in setting the AEWR and that the Final Rule is arbitrary and capricious. [Doc. 13 at 8-20; Doc. 47 at 7-10].

### a. Exceeds Statutory Authority

"When reviewing a particular agency action challenged under § 706(2) of the APA, the court is first required to decide whether the agency acted within the scope of its authority." Kentuckians for Commonwealth, Inc. v. Rivenburgh, 317 F.3d 425, 439 (4th Cir. 2003) (quoting in part Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971) (internal quotation marks and brackets omitted)). "The authority of administrative agencies is constrained by the language of the statute they administer." Texas v. United States, 497 F.3d 491, 500-01 (5th Cir. 2007).

In enacting the IRCA, Congress tasked DOL with ensuring that the importation of foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." See 8 U.S.C. § 1188(a)(1)(B); AFL-CIO v. Dole, 923 F.2d 182, 187 (D.C. Cir. 1991) (noting that IRCA requires DOL to balance the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers"). The statute does not define what it means to "adversely affect," nor does it specify how such adverse effect should be measured in calculating the AEWR. As the Fourth Circuit has recognized, the statute

21

"grants [the Secretary] broad discretionary authority to choose any reasonable formula to compute such a figure." Rowland v. Marshall, 650 F.2d 28, 30 (4th Cir. 1981); see also Brock, 835 F.2d at 914 (noting that IRCA does not define "adverse effect" or specify manner in which AEWR is to be calculated, finding that DOL "is entrusted with these tasks").

The Agency argues that its use of nonagricultural wage data to calculate the AEWR is reasonable and is a more effective method of accomplishing the statute's goals because it is "designed to eliminate the incongruities embedded within the 2010 AEWR methodology." [Doc. 17 at 13]. For example, the Agency argues, there are certain occupations—such as a truck driver—where the skills, qualifications, and tasks of the occupation are the same in both an agricultural and nonagricultural context. [Id. at 13-14]. However, if a truck driver is currently driving for a nonagricultural employer, his wage will not be factored into the calculation of the AEWR for an H-2A truck driver role, even if he would be willing and able to work as a truck driver for an agricultural employer. [Id.]. Accordingly, the Agency argues, by failing to capture domestic workers like truck drivers, the AEWR for H-2A positions that have substantial overlap with nonagricultural positions might be artificially depressed. [Id. at 14].

Similarly, in its notice of proposed rulemaking, the Agency justified its proposed changes by noting that, while "the FLS is the most accurate and comprehensive wage source to determine the AEWRs for field and livestock workers, . . . the OEWS survey is a more accurate data source for other agricultural occupations, such as supervisors, that the FLS does not adequately or consistently survey." 86 Fed. Reg. at 68181. Additionally, the Agency noted, "the OEWS survey includes occupations that are more often contracted-for services than farmer- employed (e.g., construction, equipment operators supporting farm production), which makes the OEWS data collection from farm labor contractors a better data source for determining AEWRs and protecting against adverse effect for these occupations." Id.

The Plaintiffs argue that the agency's chosen method of calculating the AEWR is unreasonable and contrary to the statute because, although the statute "does not provide a formula for calculating AEWRs, it still limits the DOL to protecting the wages of agricultural workers." [Doc. 23 at 3]. Even if the DOL were limited to considering only the interests of similarly employed agricultural workers, the Agency explained that it determined that in order to prevent wage depression *for agricultural workers* it is necessary to consider some nonagricultural wages. The Plaintiffs' contention that it would be more protective of agricultural workers to consider only agricultural wages is a

23

policy disagreement with the Agency, not a meaningful argument that the Agency's construction is unreasonable or otherwise impermissible.

The Court concludes that the Plaintiffs have not made an adequate showing at this stage that the Agency has exceeded its statutory authority or that its construction of the statute is unreasonable. Based on the record that is presently before the Court, it appears that the Agency, in its discretion, determined that failing to consider the wages of employees working outside of the agricultural industry—or within the industry and simply not captured by the FLS because they work for contractors—depressed the wages of workers in some occupations. As it is mandated to prevent adverse effects on domestic workers, the Agency adopted the Final Rule to counter this wage depression. Therefore, at this stage, the Court concludes that the Plaintiffs are not likely to show that the Agency's action was an unreasonable interpretation of its duties under the statute.[13]

---

[13] The Plaintiffs have made no argument that the Final Rule fails to balance the statute's other policy goal of providing an adequate labor supply. The Agency's justification for the rule explains that there may be an adequate supply of domestic workers in nonagricultural industries ready and willing to perform agricultural work were it not for the wage depressive effects of prior AEWR methodologies. Accordingly, it seems the Final Rule would *increase* the available domestic labor pool.

24

### b. Arbitrary and Capricious

The Plaintiffs also argue that the Final Rule is arbitrary and capricious. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." <u>Id.</u> However, courts must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Id.</u> (citation and internal quotation marks omitted).

Here, the Plaintiffs argue that the Final Rule is arbitrary and capricious in that: (1) the Agency's "totality of the circumstances" test to determine an occupation's classification is illogical because it excludes consideration of the primary duty of a given job; (2) the Agency failed to consider the Final Rule's effect on illegal immigration and the food supply; and (3) the Agency

failed to consider the costs associated with the Final Rule. [Doc. 13 at 11-20]. The Court will consider each argument in turn.

### i.     Totality of the Circumstances Test

The Plaintiffs argue that the Final Rule is illogical because it uses a totality of the circumstances test to assign a job opportunity to a Standard Occupational Classification (SOC), rather than assigning opportunities based on the job opportunity's primary duty.  [Doc. 13 at 18].  The Agency argues that it considered using a "primary purpose" test but ultimately rejected it in favor of the "totality of the circumstances" test, and that its determination in this regard was reasonable.  [Doc. 17 at 23].

The Final Rule includes the following explanation for why the DOL ultimately rejected the primary purpose test:

> [T]he Department is concerned with how such [a test] would work in practice. Rather than resulting in more appropriate and consistent AEWR determinations, assigning an SOC code based on the "primary duties" or the percentage of time identified for each duty in an employer's job opportunity description could permit or encourage employers to combine work from various SOC codes, interspersing higher-skilled, higher-paying work among many workers so that the higher-paying work is never a duty performed by any one employee more than the specified percentage.  Such an approach would undermine the Department's goals of providing predictability, consistency, and administrative efficiency in AEWR determinations, and of preventing inaccurate SOC

26

code assignment. In addition, such an approach to assigning SOC codes could permit an employer to gain the benefit of work in a higher paid SOC code, while paying less than the AEWR applicable to that work. Ultimately, a ''primary duties''-type approach runs a risk of adversely affecting the wages of workers in the United States who are employed in the higher paid SOC code. In addition, implementing the ''percentage per duty'' disclosure requirement would increase administrative burden for employers (e.g., substantial recordkeeping to ensure that the actual work each worker performed aligns with the percentages disclosed), and potentially restrict fluid movement of workers among all the duties the employer requires in the job opportunity, which was a concern many commenters expressed. The Department believes that the CO's review of the totality of each H-2A job opportunity, as discussed above, addresses commenters' concerns regarding consistency and accuracy of SOC code assignment, without increasing administrative burden, complexity, or risk of inadequate AEWRs.

88 Fed. Reg. at 12781-82.

The Plaintiffs also take issue with the Agency's choice that, if after performing a totality of the circumstances analysis the CO determines that multiple SOCs should be assigned to a position, the position will be paid at the highest applicable AEWR. [Doc. 13 at 19-20]. The Agency justified that choice by stating:

Use of the highest applicable wage in these cases reduces the potential for employers to offer and pay workers a wage rate that, while appropriate for the general duties to be performed, is not appropriate for

27

other, more specialized duties the employer requires. In addition, use of the highest applicable wage imposes a lower recordkeeping burden than if the Department permitted employers to pay different AEWRs for job duties falling within different SOC codes on a single Application for Temporary Employment Certification. This policy is also consistent with the way the Department determines prevailing wage rates for jobs that cover multiple SOC codes in other employment-based visa programs.

Id. at 12783.

The Plaintiffs have not made an adequate showing that the Agency's reasoning in this regard is illogical. The Agency considered the alternative test for which the Plaintiffs advocate and rejected it, citing fears that such a test could be abused to the detriment of workers and would lead to unnecessary administrative burden. Similarly, the Agency justified its choice to assign job opportunities the highest applicable AEWR by reasoning that it would prevent employers from underpaying workers from whom they expect higher-skill, specialized work. The Agency has articulated its reasoning and determined that the totality of the circumstances test and policy of assigning the highest applicable AEWR best accomplished its statutory mandate to protect against adverse effects to workers. Accordingly, the Court concludes that based on the record before it at this stage the Plaintiffs have not shown

that they are likely to succeed on the merits on the question of whether

adopting the totality of the circumstances test was arbitrary and capricious.

## ii.    Costs

Next, the Plaintiffs argue that the Agency failed to consider the costs

that the Final Rule imposes on H-2A employers.  [Doc. 13 at 16].  However,

a review of the Final Rule makes clear that the DOL *did* consider the costs

associated with its implementation.  For example, the Agency noted that it

had received comments concerned with the increased costs associated with

the new AEWR methodology, stating:

> Multiple commenters stated the Department underestimated cost increases for employers and suggested the rule should be economically significant.  The comments claimed this increased labor cost can put pressure on farms and reduce their advantage in the global marketplace and regional marketplaces, and potentially put them out of business.  The Department recognizes that there will be some cost increases to some employers as described in the analysis of transfer payments section.  The analysis in this final rule estimates the impacts of the rule based on actual wage records in Fiscal Year (FY) 2020 and FY 2021 to determine the most accurate impact of the revised AEWR structure in the final rule.  Of the 25,150 certifications between FY 2020 and FY 2021, only 732 (2.91 percent) have wage impacts and the average certification would have an impact of $63,943 with an average per worker wage impact of $5,117.  Based on the Department's analysis, the overall transfer payments

> imposed by the rule are less than $100 million and, therefore, not economically significant.

88 Fed. Reg. at 12785. The Final Rule also included an analysis of the ten-year cost of the rule and estimated an increased average transfer of $37.5 million from employers to workers under the rule. Id. at 12795. Accordingly, the argument that the Agency failed to consider cost at all is unsupported by the record.

The upshot of the Plaintiffs' argument appears to be that they *disagree* with the Agency's cost analysis because it did not include an analysis of the impact on workers who, under the new rule, will be reclassified, assigned multiple SOCs, and paid the highest applicable AEWR. [Doc. 13 at 16-17]. The Plaintiffs point to the following statement in the Final Rule as supporting their contention that the Agency's cost analysis was improper:

> The Department understands that we may have underestimated the impact of the revised AEWR structure due to the final rule's new requirement to pay the highest of applicable SOC code AEWRs. However, the Department does not have any data readily available to estimate the number of workers that may have their SOC codes reclassified as a result of the final rule, and commenters did not provide such data in their comments on the NPRM. In addition, the Department considers the impact of this potential underestimation to be *de minimis* for the reasons included in our discussion and clarification above regarding SOC assignment and assignment of the highest AEWR applicable, namely, that the

Department anticipates low incidence of multiple SOCs assigned, resulting in job opportunities subject to the highest of multiple AEWRs.

88 Fed. Reg. at 12785. This explanation shows that the DOL made a prediction using the data available.[14] The Plaintiffs have not shown that the DOL was willfully blind to what data would be needed or failed to diligently pursue the information on which one would rationally base such a determination. Rather, the Plaintiffs apparently seem to disagree with the DOL's conclusion that any unaccounted-for cost would be *de minimis*. However, "the APA does not give [courts] license to second-guess an agency's well-reasoned decision simply because a party disagrees with the

---

[14] The Plaintiffs argue that one commenter submitted a comment regarding the number of workers who would need to be reclassified, citing the American Farm Bureau Federation's comment and stating that: "The American Farm Bureau Federation estimated that 10% of workers would be reclassified, based on publicly available sources." [Doc. 13 at 17]. But the comment actually stated that based on the Federation's review of the FLS data, 90% of workers surveyed were in one of the six occupations for which the AEWR will be set using FLS data and 10% were in an occupation for which the AEWR will be set using OEWS Survey data. Am. Farm Bureau Fed'n, Comment Letter on Proposed Rule on the Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States (Jan. 31, 2022), https://www.regulations.gov/comment/ETA-2021-0006-0086. This is the same calculation that the DOL performed using their internal data, which is how it arrived at its estimation that 98% of workers would continue to have their AEWR set using FLS data. Both estimations considered workers' *current* classifications, not the potential that workers in one of the six occupations for which the AEWR method will be unchanged will be reclassified after the DOL's totality of the circumstances test goes into effect. The Federation's comment makes clear that it was not estimating the number of workers that would be reclassified, specifically stating that "these numbers could skew greater" once the reclassification process and the assignment of the highest applicable AEWR took place. Id. As the Agency has explained, the only way to find out the number of workers affected by reclassification would be to "review of each case in the certification dataset, which totaled 25,150 certifications for fiscal years 2020 and 2021." [Doc. 17 at 16].

31

outcome." Am. Whitewater v. Tidwell, 770 F.3d 1108, 1116 (4th Cir. 2014). Thus, the Court concludes based on the record before it that the Plaintiffs have failed to show that they are likely to succeed on the merits on the question of whether the DOL's consideration of cost was arbitrary and capricious.

### iii.    Effect on Illegal Immigration and Food Supply

Finally, the Plaintiffs argue that the Final Rule was arbitrary and capricious because the Agency failed to consider the effects of the Final Rule on illegal immigration and on the food supply. [Doc. 13 at 14]. The Plaintiffs argue these were important, relevant factors that the Agency was required to consider in its rulemaking. [Id. at 15-16].

As for the Final Rule's effect on food supply, the Plaintiffs' primary concern is that the Final Rule will enormously inflate food costs, leading to food insecurity for consumers who could no longer afford food at inflated prices. [Id. at 16]. They argue the Agency's failure to consider this inflation was arbitrary and capricious. However, the Agency considered concerns that the Final Rule would inflate food costs and rejected such concerns, stating:

> The Department does not have data to quantify impacts on food inflation from the estimated wage transfers. However, the Department reiterates that

32

the analysis shows only 2.9 percent of certifications would have wage impacts under the AEWR methodology in this final rule and, as discussed in the Regulatory Flexibility Act of 1980 (RFA), the wage impacts are not significant for 98 percent of small employers. The Department does not expect this final rule alone will cause a general increase in food prices because there are many other factors such as an overall increase in the price level and an increase in the transportation and material costs that would have more substantive impacts on food prices.

88 Fed. Reg. at 12786. Accordingly, as with their argument that the Agency did not consider the costs of the Final Rule, the Plaintiffs simply disagree with the Agency's evaluation. The Agency considered the possibility of food inflation and reasonably rejected it because of its estimation that the Final Rule would not have an economically significant effect. Accordingly the Court concludes based on the record before it that the Plaintiffs have failed to show that they are likely to succeed on the merits on the question of whether the Agency's consideration of the effects of the Final Rule on the food supply was arbitrary and capricious.

As for the effects of the Final Rule on illegal immigration, the Plaintiffs argue that consideration of this factor was relevant because "the Final Rule will strongly discourage employers from using the H-2A program and thus has a predictable effect of increasing the employment of unauthorized workers, which would itself depress wages." [Doc. 13 at 14-15]. The Agency

33

acknowledged that concern but reiterated its prediction that the Final Rule would *increase* wages for domestic workers, not depress them. Specifically, the Agency acknowledged that some commentors had concerns about implementing the Final Rule without "other program changes or addressing the undocumented workforce" and responded that while it was "sensitive" to these concerns, the "purpose of this rulemaking effort is to establish an AEWR methodology that guards against potential wage depression among similarly employed workers in areas where employers hire H–2A workers in accordance with H–2A program requirements." 88 Fed. Reg. at 12765. The Agency further concluded that the new AEWR methodology would prevent the wage depressive effects of previous methodologies. Id. at 12796. The Plaintiffs apparently disagree with the Agency's prediction that the Final Rule will not depress wages. However, they have failed to present evidence to show the impact of the pool of unauthorized worker, or that the DOL ignored a substantial factor. Simply arguing that consideration of some other factor would render a different result is not a substitute for presenting evidence showing the likelihood of proving such. Therefore, at this stage, they have not shown that they are likely to succeed on the merits of the question of whether the Agency's determination in this regard was arbitrary and capricious.

For all these reasons, the Court concludes on the current record before it that the Plaintiff have failed to show that they are likely to succeed on the merits of their claims that the Agency exceeded its statutory authority or acted in an arbitrary and capricious manner when it enacted the Final Rule.

## 2.    Irreparable Harm

Here, the Plaintiffs contend that, in the absence of interim injunctive relief, they will suffer irreparable harm in the form of "lost profits, losing access to the H-2A program, scaling back operations, and even going out of business" as a result of the implementation of the Final Rule.  [Doc. 13 at 20-24; Doc. 47 at 10-11].

Generally, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough" to establish irreparable harm.  See Roe v. Dep't of Defense, 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase, 872 F.3d at 230) (internal quotation marks and alteration omitted).  Financial losses may constitute irreparable harm, however, where the plaintiff cannot recoup its losses later due to the defendant's sovereign immunity.  See Feinerman v. Bernardi, 558 F.Supp.2d 36, 51 (D.D.C. 2008); accord Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019) ("[E]conomic damages may constitute irreparable harm where no remedy is

available at the conclusion of litigation.").  As the Supreme Court has warned, however, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22.  Without a showing that they are likely to succeed on the merits of their claims, the Plaintiffs' showing of irreparable harm does not warrant the injunctive relief requested.

### 3.    The Balance of Equities and the Public Interest

A plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in its favor and must establish that the granting of an injunction is in the public interest.    Winter, 555 U.S. at 20.  These factors "merge when the Government is the opposing party."  Nken v. Holder, 556 U.S. 418, 435 (2009).

Here, while the Plaintiffs have made at least a preliminary showing of irreparable harm, the Plaintiffs have failed to demonstrate a likelihood of success on the merits.  They have further failed to show that the threatened irreparable injury outweighs the threatened harm that a preliminary injunction would cause parties who are not represented in this action, such H-2A and corresponding U.S. workers who would benefit from the 2023 Final Rule.

36

The requested injunction could cause at least as much harm to these third-party workers, who would be deprived of wages that they are entitled to under the Final Rule, as a denial would harm the Plaintiffs, who would potentially avoid having to pay these wages. The requested injunction also would inject a degree of uncertainty into the H-2A program because employers using the program would be uncertain about how much they will owe workers if DOL ultimately prevails in this action. See Di Biase, 872 F.3d at 235-36 ("Given the administrative challenges and confusion for the retirees who must navigate the process of securing healthcare coverage each time the approach for providing healthcare benefits changes, and that Plaintiffs have not demonstrated a likelihood of success on the merits or irreparable harm, the balance of equities and the public interest are better served by allowing the underlying litigation proceed to a decision on the merits.").

Moreover, an injunction that prohibits the enforcement of a statute enacted by a people's elected representatives constitutes an irreparable injury that counsels against entry of injunctive relief. See New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) ("any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). As the Fourth Circuit has

37

recognized, this concern weighs particularly heavily with respect to the enforcement of immigration laws, which implicates the government's "sovereign prerogative." Miranda v. Garland, 34 F.4th 338, 365-66 (4th Cir. 2022); see also Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("[T]he public interest in enforcement of the immigration laws is significant[.]").

For these reasons, the Court concludes that the balance of equities and the public interest favor denying preliminary relief.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiffs have standing to assert their claims under the APA. Accordingly, the Defendants' Motion to Dismiss is denied. The Court further finds and concludes that the Plaintiffs have failed to demonstrate a likelihood of success on the merits, have failed to show irreparable harm should preliminary relief not be granted, and have failed to show that the balance of equities and the public interest tips in their favor. Accordingly, the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction are denied.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. 37] is **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiffs' Motion for Preliminary Injunction [Doc. 12] and the Plaintiffs' Motion for Temporary Restraining Order [Doc. 46] are **DENIED**.

**IT IS SO ORDERED.**

Signed: September 26, 2023

Martin Reidinger
Chief United States District Judge