# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

USA FARM LABOR, INC., et al.     )
                                      )

              Plaintiffs,    )   **MEMORANDUM IN SUPPORT OF**
                                        )   **PLAINTIFFS' MOTION FOR**
      v.                   )   **SUMMARY JUDGMENT**
                                        )

JULIE SU, et al.              )   Civil Action No.: 1:23-96
                                        )

             Defendants.    )

The Court should vacate and set aside the Final Rule because it is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law. 5 U.S.C. § 706(2); Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 88 Fed. Reg. 12,760 (Feb. 28, 2023) ("Final Rule").

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiffs are a group of 23 farms and agri-businesses that utilize the H-2A visa program as well as one H-2A filing agent. Ex. 1, Declaration of Manuel Fick at 1, 4.

2. Plaintiff farms and agri-businesses have utilized the H-2A visa program in recent years to hire agricultural workers.[1]

---

[1] Affidavits of: Russ Hoggard (ex. 3) at 1, Justin and Jennifer Bebb (ex. 4) at 1, Joel Lyman (ex. 5) at 1, Lynette (Bo) Young (ex. 6) at 1, John Petron (ex. 7) at 1, Frank Kasten III (ex. 8) at 1, Michael Bushman (ex. 9) at 1, Scott Schiff (ex. 10) at 1, David Masching (ex. 12) at 1, Emily Swift (ex. 13) at 1, Mark Deacon (ex. 14) at 1, and Roger T. Haaland (ex. 15) at 1.

3. Plaintiff USA Farm Labor, Inc. is an H-2A filing agent that assists employers with the H-2A process. Ex. 1, Declaration of Manuel Fick at 1.

4. On February 28, 2023 the U.S. Department of Labor ("DOL") promulgated a new regulation changing the methodology for determining the Adverse Effect Wage Rate ("AEWR"). *See* Final Rule.

5. The AEWR is a minimum wage that employers must pay to H-2A workers and to all U.S. workers in corresponding employment. Final Rule, 88 Fed. Reg. at 12,761-62, 12,783.

6. The Final Rule uses data from the U.S. Department of Agriculture's ("USDA") Farm Labor Survey to set wages for six occupations in the "field and livestock workers (combined)" category, including: Farmworkers and Laborers, Crop, Nursery and Greenhouse Workers (45-2092); Farmworkers, Farm, Ranch, and Aquacultural Animals (45-2093); Agricultural Equipment Operators (45-2091); Packers and Packagers, Hand (53-7064); Graders and Sorters, Agricultural Products (45-2041); and All Other Agricultural Workers (45-2099). Final Rule, 88 Fed. Reg. at 12,766.

7. For agricultural positions outside the six protected categories, the Final Rule will use wage data from the Occupational Employment and Wage Statistics survey ("OEWS"). *Id.* at 12,760.

8. DOL intended that OEWS data would be used for "more specialized, higher paid job opportunities" such as "construction labor, logging workers, heavy truck and tractor-trailer drivers, first-line supervisors," and mechanics. *Id.* at 12,778, 12,782-83.

9. DOL intended that jobs assigned OEWS wages would receive higher pay than under the prior system. *Id.* at 12,761.

10. "Where an employer's job opportunity involves a variety of duties, some of which are consistent with higher paid [occupations]," DOL will assign the highest AEWR applicable to any of those occupations. *Id.* at 12,778.

11. Any job duty consistent with a higher paid occupation will trigger a higher AEWR without regard to how much time a worker spends performing that duty. *Id.* at 12,781-82.

12. Several plaintiff farms and agribusinesses use H-2A workers to perform the types of specialized labor targeted for OEWS wages under the Final Rule. Twelve plaintiffs expressed a need for H-2A workers for trucking.[2] Two plaintiffs state they use H-2A workers for construction.[3] Eight plaintiffs state they use H-2A workers for mechanic duties.[4]

13. Plaintiff Four R's Ranch estimated its expenses would increase by $98,582.03 annually for truck drivers and $616,137.64 for all its workers due to the Final Rule. Ex. 11, Second Supplemental Declaration of Scott Schiff at 1.

---

[2] Affidavits of: John Petron (ex. 7) at 1, Justin and Jennifer Bebb (ex. 4) at 1, Russ Hoggard (ex. 3) at 1, Lynette (Bo) Young (ex. 6) at 2, Joel Lyman (ex. 5) at 1, Emily Swift (ex. 13) at 2, Frank Kasten III (ex. 8) at 1, Scott Schiff (ex. 10) at 1-2, Michael Bushman (ex. 9) at 2, David Masching (ex. 12) at 1, Mark Deacon (ex. 14) at 1, and Roger Haaland (ex. 15) at 2; ex. 11, Second Supplemental Affidavit of Scott Schiff at 11.

[3] Affidavits of: Joel Lyman (ex. 5) at 1 and Frank Kasten III (ex. 8) at 1.

[4] Affidavits of: John Petron (ex. 7) at 1, Justin and Jennifer Bebb (ex. 4) at 1, Russ Hoggard (ex. 3) at 1, Joel Lyman (ex. 5) at 1, Emily Swift (ex. 13) at 2, Scott Schiff (ex. 10) at 1-3, Mark Deacon (ex. 14) at 1, and Roger Haaland (ex. 15) at 2.

14. *Amici curiae* forecast the Final Rule would result in agricultural employers paying higher wages. James Simpson forecast a 49% wage increase from $13.67 per hour to $20.42 per hour for trucking work. Doc. 30 at 2. Stephanus De Klerk forecast a 66% wage increase from $13.67 per hour to $22.67 per hour for mechanic work. Doc. 30 at 2.

15. Plaintiff USA Farm Labor surveyed its clients. Of 287 respondents, all but ten said they use H-2A workers to do the types of labor singled out by the Final Rule for higher wages: heavy trucking, mechanic work, transporting other employees, construction, and supervision. Ex. 1, Declaration of Manuel Fick at 2

16. USA Farm Labor estimated it would lose $1.1M to over $3M in revenue due to its clients no longer using the H-2A program due to labor becoming unaffordable under the Final Rule. Ex. 1, Declaration of Manuel Fick at 3.

17. Five prospective clients of USA Farm Labor signed affidavits saying they declined to use USA Farm Labor's services for H-2A visas due to the higher wages expected under the Final Rule.[5]

## ARGUMENT

### 1. DOL Lacks Authority to Independently Issue the Final Rule

The Immigration Reform and Control Act ("IRCA")[6] requires the Attorney General to approve any H-2A regulations, after consultation with DOL and USDA.

---

[5] Affidavits of: Josh Wurmnest, Caitlin Heap, Trevor Jacobsen, Travis Berthold, and Mindy Gillespie (exs. 16-20).

[6] Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat 3359 (Nov. 6, 1986).

The Final Rule was not approved by the Attorney General nor was there any consultation with USDA, so the regulation is invalid.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "[A]n agency literally has no power to act…unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). To have the force of law, "the promulgation of…regulations must conform with any procedural requirements imposed by Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979). "[A]gency discretion is limited not only by substantive, statutory grants of authority, but also by the procedural requirements which 'assure fairness and mature consideration of rules of general application.'" *Id.* (quoting *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969)).

IRCA authorizes DOL to promulgate H-2A regulations. However, DOL's authority to promulgate regulations is conditioned on prior approval from the Attorney General:

> The Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, shall approve all regulations to be issued implementing sections 101(a)(15)(H)(ii)(a) and 218 of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188].

IRCA § 301(e), as amended by Pub. L. 100–525, § 2(l)(4), Oct. 24, 1988, 102 Stat. 2612. Per the plain language of § 301(e) of IRCA, the Final Rule is not effective unless (1) the Attorney General has approved it and (2) the Attorney General has

consulted with the Secretary of Labor and the Secretary of Agriculture before approving the regulations. S. Rep. No. 99-132 at 14 (1986) ("The bill provides that all regulations implementing the program must be approved by the Attorney General after consultation with the Secretary of Labor and Secretary of Agriculture.").

Congress imposed these conditions to protect agricultural employers through involving the Secretary of Agriculture and to protect the Attorney General's role as the primary interpreter of the immigration laws. These reasons were fully explained by Congress during the promulgation of IRCA as early as 1983, three years before IRCA was passed:

> Section 211(d) requires the Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, to approve all regulations implementing the amendments of this section before they are issued. It is the Committee's intent that the Secretary of Labor will continue to issue all regulations relating to labor certification. Nevertheless, the Committee believes that the Department of Agriculture should have a meaningful role in formulating regulations of the H-2 (a) program, which deal with the particular needs of agriculture. As the final nonjudicial authority on the proper interpretation of immigration laws, the Attorney General should approve, after consultation with both the Department of Labor and the Department of Agriculture, regulations governing the admissibility of agricultural H-2 workers under this section.

S. Rep. No. 98-62, at 49 (1983). This provision was still important to Congress three years later when IRCA was passed:

> Section 122(g) requires the Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, to approve all regulations implementing INA sections 101(a)(15)(N) and 216, added by this bill, before they are issued. The Committee believes that the Attorney General, as the final nonjudicial authority on the proper interpretation of immigration laws, should approve all regulations relating to "N" workers. The Committee

intends that the Secretary of Labor continue to issue all regulations relating to labor certification, but believes that the Department of Agriculture should have a meaningful advisory role in formulating regulations for the "N" program, since these will be concerned with the particular needs of agriculture.

S. Rep. No. 99-132 at 41 (1986).

As IRCA was being negotiated, the Reagan Administration expressed its opposition to this provision, preferring instead that DOL issue regulations after consultation with the Departments of Justice and Agriculture, "The Administration supports S. 1200's temporary worker reforms except that the Secretary of Labor will issue the regulations governing labor certification under this program after meaningful consultation with the Departments of Justice and Agriculture." H.R. Rep. No. 99-682, pt. 1, at 122 (1986) (Administration Statement of Principles). But Congress ignored the administration and kept IRCA as-is to protect the needs of agriculture and the Attorney General's role as interpreter of the immigration laws.

The requirement for DOJ to approve all regulations after consultation with DOL and USDA was no mere afterthought or accident; it was a crucial part of the political compromise that led to IRCA. The agricultural industry dropped its opposition to immigration reform based on the belief that its interests would be protected by USDA.[7] The Final Rule upends that compromise. Far from building

[7] Statement of the National Council of Agricultural Employers before the Subcommittee on Immigration, Refugees and International Law of the House Committee on the Judiciary regarding H.R. 1510 the Immigration Reform and Control Act of 1983 by Perry Ellsworth, Executive Vice President, March 10, 1983 (expressing non-opposition to employer sanctions if paired with a way to obtain needed labor from outside the country; urging that "the Attorney General, in consultation with the Secretary of Labor, and in connection with agricultural labor

7

on meaningful consultation with USDA, the Final Rule pushes USDA's wage data out of the picture for all workers outside of the six protected occupations. Rather than serving the needs of both agriculture and labor, as Congress intended, the Final Rule turns IRCA into a labor organizing statute. The Final Rule seeks to strengthen the bargaining position of workers, a goal utterly foreign to IRCA. Final Rule, 88 Fed. Reg. at 12788 ("The AEWR…strengthen[s] the ability of this particularly vulnerable labor force to negotiate over wages with growers…."). The Final Rule is precisely the type of regulation Congress sought to protect against when it required DOJ's approval of all H-2A regulations after consultation with DOL and USDA.

Neither the Final Rule nor the Administrative Record indicates that the Attorney General gave his prior approval or that the required consultations took place. The Final Rule is "in excess of statutory…authority," "without observance of procedure required by law," and must be vacated. 5 U.S.C. § 706(2).

## 2. The Final Rule is Arbitrary, Capricious, and Not the Product of Reasoned Decision-Making

### a. The APA Requires Reasoned Decision-Making

The Administrative Procedure Act ("APA") directs courts to "hold unlawful

---

or services, the Secretary of Agriculture, shall approve all regulations to be issued implementing the amendments made by Section 211… Just as the Secretary of Labor has concern for workers, the Secretary of Agriculture is concerned with the production of food and fiber. The latter individual's views are essential where the H-2 program or any other agricultural worker program is under discussion."). The statement is available in "Immigration Reform and Control Act of 1983 – Hearings Before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary – House of Representatives – Ninety-Eighth Congress – First session on H.R. 10 Immigration Reform and Control Act of 1983, Serial No. 2" at 460-65.

and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(A)(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192-93 (4th Cir. 2009) (citations omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

The classic statement of the agency's burden is:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*State Farm*, 463 U.S. at 43.

The agency's reasoning must be "satisfactory."  For example, the *en banc* Fourth Circuit affirmed an injunction against a regulation of the Department of Health and Human Services, finding its reasoning was not "satisfactory" because it required healthcare providers to violate medical ethics.  *Mayor of Balt. v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (*en banc*).

A satisfactory explanation is one that acknowledges and explains how the agency's choices effectuate the purposes of the statute. *See Sierra Club v. United States DOI*, 899 F.3d 260, 294 (4th Cir. 2018). A satisfactory explanation also identifies the benefits and costs of various courses of action and weighs them in light of the statutory objectives. Any disadvantage counts as a cost, not just costs of compliance. *Michigan*, 576 U.S. at 752. Thus, for its reasoning to be satisfactory, the agency must, based on the evidentiary record, articulate (rather than speculate about) the benefits of the various proposals it considered and compare those benefits to the costs to make sure they are worth it in a world of limited resources and competing priorities. *See Mt. Valley Pipeline, LLC v. N.C. Dep't of Envtl. Quality*, 990 F.3d 818, 833 (4th Cir. 2021) ("Given a choice between two options, the Department had the obligation to explain why it chose one over another." (*citing DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) and *State Farm*, 463 U.S. at 46-47)).

The satisfactoriness of the agency's explanation is assessed in light of the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Kisor v. Wilkie*, 139 S. Ct.

2400, 2417 (2019) (courts should reject an interpretation newly advanced as a convenient litigating position or "*post hoc* rationalizatio[n] advanced" to "defend past agency action against attack."). "Permitting agencies to invoke belated justifications…can upset the orderly functioning of the process of review, forcing both litigants and courts to chase a moving target." *DHS v. Regents*, 140 S. Ct. at 1909 (quotation marks and citation omitted).

Thus, even if an agency presents its decision with the formal characteristics of logic, it is still unlawful if it does not qualify as "reasoned decision making." *Michigan*, 576 U.S. at 750 (EPA acted arbitrarily by failing to consider all statutorily relevant factors; multi-decade rulemaking proceeding overturned); *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (agency rule was not in accordance with law; agency reversed); *Dir., Off. of Workers' Comp. Programs, DOL v. Greenwich Collieries*, 512 U.S. 267, 269 (1994) (DOL rule allocating burden of persuasion conflicted with APA; agency reversed). A veneer of rationality is not enough; the decision must qualify as "reasoned decision making."

### b. The Final Rule Does Not Effectuate IRCA's Objectives

The APA requires an agency to explain how its "decisions effectuate the purposes of the governing law." *Indus. Union Dep't, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 670 (1980) (Powell, J., concurring). The Final Rule does not do that.

Initially, the agency fails to articulate Congress' statutory purposes. DOL does not acknowledge that control of illegal immigration was Congress's primary purpose

in passing IRCA. *Egbuna v. Time-Life Libraries*, 153 F.3d 184, 187 (4th Cir. 1998)

("[IRCA] was enacted to reduce the influx of illegal immigrants into the United

States by eliminating the job magnet."). Nor does DOL mention Congress's

concerns for competitiveness of U.S. food producers or the national security

concerns arising from outsourcing the nation's food supply. As Deputy Secretary of

Agriculture John Norton III explained during deliberations on IRCA:

> In agriculture, undocumented workers are primarily engaged in seasonal
> harvest work throughout the U.S. As we move toward implementation of
> employer sanctions, we must at the same time prevent labor shortfalls and
> dislocations which have the potential to disrupt harvests and interfere with the
> marketing process. The national economy and the American consumer depend
> upon a stable and adequate supply of agricultural labor to maintain commodity
> supplies at reasonable prices.[8]

DOL was focused on this concern as recently as 2020 but disregarded it in the Final

Rule.[9]

The Final Rule, of course, discusses adverse effect and DOL's concerns that

the potential for adverse effect exists absent the Final Rule. Final Rule, 88 Fed. Reg.

---

[8] Testimony of Deputy Secretary of Agriculture John R. Norton III before the
House Subcommittee on Immigration Refugees, and International Law, Sept. 30,
1985, reprinted in 1986 U.S. Code Cong. & Admin. News at 5687.

[9] Adverse Effect Wage Rate Methodology for the Temporary Employment of H-
2A Nonimmigrants in Non-Range Occupations in the United States, 85 Fed. Reg.
70,445-01, 70,455 (Nov. 5, 2020) ("The Department remains cognizant of the fact
that the clear congressional intent was to make the H-2A program usable, not to
make U.S. producers non-competitive and that unreasonably high AEWRs could
endanger the total U.S. domestic agribusiness, because the international
competitive position of U.S. agriculture is quite fragile.").

at 12,761. But that was not Congress's only objective. Because of DOL's hyperfocus on "adverse effect," DOL failed to articulate Congress's objectives and failed to explain how DOL's chosen rule effectuates *all* statutory objectives.

This is particularly evident in DOL's treatment of illegal immigration. Several commenters questioned DOL's treatment (or non-treatment) of the issue in the Notice of Proposed Rulemaking. They pointed out that increasing the AEWR incentivizes the employment of undocumented workers in agriculture.[10] DOL dismissed those concerns, saying merely that it was "sensitive to the commenters' general concerns" but "the purpose of this rulemaking effort is to establish an AEWR methodology that guards against potential wage depression…." *Id.* at 12,765. DOL's implicit claim that the AEWR formula has nothing to do with the statutory objectives does not withstand scrutiny. DOL acknowledged the link between the two as recently as 2020, "Setting AEWRs that are too high in any given area will harm U.S. workers indirectly by providing an incentive for employers to hire undocumented

---

[10] Farmer Law PC, Comments on Proposed Rulemaking, Docket No. ETA-2021-0006-0067, 5 (Feb. 1, 2022), https://downloads.regulations.gov/ETA-2021-0006-0067/attachment_1.pdf ("[S]ubcontractors that use illegal labor…will be the only employers unaffected by the increased AEWR."); Wafla, Comments on Proposed Rulemaking, Docket No. ETA-2021-0006-0076, 2 (Feb. 1, 2022), https://downloads.regulations.gov/ETA-2021-0006-0076/attachment_1.pdf ("[T]he AEWR is putting farmers out of business, encouraging undocumented immigration…."); Hall Law Office, PLLC, Comments on Proposed Rulemaking, Docket No. ETA-2021-0006-0092, 7 (Feb. 7, 2022), https://downloads.regulations.gov/ETA-2021-0006-0092/attachment_2.pdf ("Without [a secure, legal channel for labor], the incentive to employ unauthorized aliens would remain.").

workers."[11] The Final Rule represents an unexplained departure from the agency's view of its mandate. DOL did not explain how its choice of AEWR formulas effectuates Congress's statutory objective of eliminating the jobs magnet that pulls so many people into the United States.

### c. DOL Did Not Measure Adverse Effect

DOL did not measure how much adverse effect would be prevented by the Final Rule. Without this, there is no empirical justification for revising the AEWR methodology. It is entirely unknown how much adverse effect will be prevented by the Final Rule. Reasoned decision-making requires weighing the costs and benefits of a proposed rule. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). DOL has refused to measure the benefit of the Final Rule—preventing adverse effect—so it cannot even begin to weigh the costs.

To engage in reason decision-making, the agency has to define the benefits as well as the costs. "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Michigan v. EPA*, 576 U.S. 743, 752 (2015). Under the Final Rule's interpretation of IRCA, there is one relevant benefit: reduction or elimination of adverse effect. The value of that benefit can be no greater than the total adverse effect prevented. To perform the analysis required by the APA, DOL must demonstrate that adverse effect exists and have some idea how much.

---

[11] Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 85 Fed. Reg. 70,445-01, 70,455 (Nov. 5, 2020) (cleaned up).

Unless DOL can demonstrate that some adverse effect exists or will exist, DOL is forced to argue that it is rational to impose hundreds of millions of dollars in economic costs in return for no demonstrable benefit. DOL cannot perform the analysis that the APA requires unless it measures adverse effect.

The lack of empirical data is first apparent when the agency explains the purpose of its rulemaking without reference to any measured adverse effect. 88 Fed. Reg. at 12,761-62. Commenters objected to the lack of any measurable benefit from the Final Rule, asserting that DOL "should or must determine the existence of adverse effect in particular areas or occupations before issuing any AEWR determination." Final Rule, 88 Fed. Reg. at 12,772. DOL's defense is that the agency need not prove past adverse effect because the AEWR is intended to prevent future adverse effect, not compensate for past adverse effect. *Id.* at 12,773. If DOL claims to prevent adverse effect, it begs the question: what adverse effect?

An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. An agency must "adduce empirical data that can readily be obtained." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (citing *State Farm*, 463 U.S. at 46-56). H-2A labor markets are susceptible to empirical study, such as DOL used to do before changing the AEWR methodology.[12] The contours of an adverse effect analysis are not

_____

[12] *See*, *e.g.*, *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology,* 54 Fed. Reg. 28,037, 28,041 (July 5, 1989) (citing "studies and analyses…conducted

difficult to discern. DOL states that adverse effect occurs from an influx of nonimmigrant workers to a local area. Final Rule, 88 Fed Reg. at 12,768, 12,772, 12,773 n76. DOL can readily determine how many H-2A workers are in a given area. The Administrative Record contains data on how many H-2A workers are present in locations across the United States. *E.g.*, AR00004, 10, 16. DOL also has data on prevailing wages throughout the United States, broken down by location and occupation.[13] The data could be analyzed to attempt to show some correlation between an influx of H-2A workers and wage depression in specific occupations. Further datasets and modes of analysis could surely be identified by DOL if it were motivated to do so, rather than sticking its head in the sand.

DOL failed to "examine the relevant data." *State Farm*, 463 U.S. at 43. DOL has been entrusted to regulate because of its supposed expertise in labor markets. It is not too much to ask that DOL use its expertise to analyze labor markets before regulating them. Until DOL has done this analysis, there is no basis for the agency's supposed concern that H-2A workers depress wages.[14]

### d. DOL Failed to Compare the Policy Alternatives

Since DOL failed to identify any benefits from the Final Rule and refused to

---

by some of the most prestigious research and evaluation organizations, applying the most rigorous state-of-the-art methodological standards.").

[13] State of Utah (under contract with DOL), "Foreign Labor Certification Data Center," https://www.flcdatacenter.com/ (last visited March 12, 2024).

[14] DOL's assumption that H-2A workers cause adverse effect is particularly dubious because every H-2A worker must receive a certification from DOL that they will *not* cause adverse effect before a visa can be issued. 8 U.S.C. § 1188(a)(1)(b).

consider the statutory objectives of IRCA, it should come as no surprise that DOL failed to properly analyze the policy alternatives.

DOL considered three major options in this rulemaking. Final Rule, 88 Fed. Reg. at 12,798. All three options involved identical treatment of workers outside the six protected occupations. *Id.* The alternatives differed only in how they would treat workers in the six occupations which, under the Final Rule, are assigned AEWRs based on the Farm Labor Survey. One option was to adopt the formula that DOL chose. *Id.* The first alternative involved using the higher of the Farm Labor Survey or OEWS wage. *Id.* The second alternative would use OEWS wages, meaning the Farm Labor Survey would be completely phased out for all occupations. *Id.*

DOL found that the Final Rule would result in transfers from employers to employees of $375M over 10 years. *Id.* The first alternative would result in transfers from employers to employees of $1.17B over ten years. Final Rule, 88 Fed. Reg. at 12,789. The second alternative would result in "transfers" from employees to employers of $751M (which really means employers keeping more of their own money). Thus, the difference between the first alternative and the second alternative was a swing of $1.92B.

When making such a profound and far-reaching economic decision, an agency should analyze the policy alternatives in light of the statutory objectives, identify the costs and benefits of each, and choose the policy that best aligns with Congress's goals. *Mt. Valley Pipeline, LLC v. N.C. Dep't of Envtl. Quality*, 990 F.3d 818, 833 (4th Cir. 2021) ("Given a choice between two options, the Department had the obligation to explain why it chose one over another."). However, DOL does not say

which policy alternative best serves IRCA's objectives. *Id.* It may be the case that the second alternative prevents more adverse effect than the option chosen by DOL, while saving money for farmers at the same time. It may also be the case that the first alternative is worth the $1.17B price because it prevents even more adverse effect. DOL is unable to say which alternative prevents the most adverse effect or by how much. While DOL chose an option that was, supposedly, middle of the road in terms of "transfers," even its lower price tag of $375M is unjustified because DOL makes no estimate of how much adverse effect will be prevented.[15]

This is an irrational approach to policymaking. "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Michigan v. EPA*, 576 U.S. 743, 752 (2015). A rational shopper comparing items that differed in cost by nearly two billion dollars would try to calculate the benefits of each; they would want to have some idea of what they were getting in return. DOL has provided no basis for the public to conclude that its diktats transferring hundreds of millions of dollars will serve any public benefit whatsoever.

### e. The Final Rule is Premised on Attracting Workers

Rather than preventing adverse effect, as directed by IRCA, the agency's justification for the Final Rule is correcting what it views as unreasonably low wage levels in agricultural labor markets to attract more domestic workers into agricultural

---

[15] It is also concerning that DOL pays no mind to whether a "transfer" involves keeping money in the pockets of American farmers or sending money overseas to immigrant workers. IRCA was intended to serve the national interest, not facilitate labor organizing by foreign workers against their American employers.

jobs. Final Rule, 88 Fed. Reg. at 12,771. As the Court noted in its September 26, 2023 Order, "[t]he Agency's justification for the rule explains that there may be an adequate supply of domestic workers in nonagricultural industries ready and willing to perform agricultural work were it not for the wage depressive effects of prior AEWR methodologies. Accordingly, it seems the Final Rule would *increase* the available domestic labor pool." Doc. 50 at 24 n13. The agency is choosing the AEWR formula based on its potential to attract U.S. workers into agriculture.

Indeed, the attractiveness of increased wages is the only rationale for the Final Rule. As for "the wage depressive effects of prior AEWR methodologies," Doc. 50 at 24 n13., DOL does not offer any evidence that such effects exist. When commenters asked DOL to demonstrate that such wage depressive effects existed, the agency declined, stating that it need not show current wage depression because the AEWR is intended to prevent future wage depression. *See* Final Rule, 88 Fed. Reg. at 12,772-73.

However, the agency has no authority to set wages based on their potential to increase the size of the domestic labor pool. "Even if desirable, the Secretary has no authority to set a wage rate on the basis of attractiveness to workers." *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976). DOL adopted *Williams* via rulemaking, so it is binding outside the Fifth Circuit the same as every other validly adopted regulation.[16] The Final Rule is *ultra vires*.

---

[16] 20 C.F.R. §§ 655.0(a); *see also* Labor Certification Process for the Temporary Employment of Aliens in Agriculture: Adverse Effect Wage Rate Methodology, 51 Fed. Reg. 24,138-01 (July 2, 1986) (stating the purpose of the AEWR is "to

### f. DOL Did Not Measure Costs

DOL did not estimate how much the Final Rule would cost farmers, and instead used an arbitrary assumption.

An agency acts unlawfully when it uses arbitrary assumptions as a baseline for its analysis and disregards available evidence that would likely contradict its preferred conclusion. *See Mayor of Balt. v. Azar v. Azar*, 973 F.3d 258, 282 (4th Cir. 2020) (*en banc*); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("An unjustified leap of logic or unwarranted assumption, however, can erode any pillar underpinning an agency action, whether constructed from the what-is or the what-may-be.").

The Final Rule provides a two-tiered wage system: workers in the six protected occupations would continue to receive wages based on the Farm Labor Survey, as they had before. But other workers would receive higher wages based on the OEWS. The costs imposed by the Final Rule derive from assigning certain workers the higher OEWS wages. The more workers who receive OEWS wages, the higher cost for farmers. The mechanism for determining which workers will receive OEWS wages is the overlapping duties rule. Final Rule, 88 Fed. Reg. at 12,778-82. If a job description contains even a single job duty that overlaps with an occupation outside of the six protected categories, the worker will receive an OEWS wage. Even if the worker only performs that job duty 5% of the time, the worker will still be assigned a higher wage. For example, a crop picker who drives a truck

---

neutralize any adverse effect resultant from the influx of temporary foreign workers." (quoting *Williams*, 531 F.2d at 306)).

to a grain elevator once per week would receive the same wage as a full-time, long haul truck driver. Taken to its logical extreme, a ranch hand who delivers hormone injections to cattle every Saturday should receive the same salary as a veterinarian. The overlapping duties rule does not consider what a worker's primary job duties are, nor how they spend most of their time. DOL made it clear that even minor, intermittent job duties would shift the job to an OEWS wage. *Id.* at 12,781.

Farmers were alarmed at the new system for assigning occupations, which has no counterpart in any other visa program.[17] Farmers wanted to know how many workers would be assigned higher wages, so they could have some sense of how much the new rule would cost them. DOL asserted that very few applications—only two percent—would receive OEWS wages. The remaining 98% of jobs would continue to receive wages based on the Farm Labor Survey, "The efficiency impact of the final rule is limited only to the 2 percent of H-2A workers whose wages the final rule will effect, while there would be no change to the [deadweight loss] for the other 98 percent of H-2A workers." *Id.* at 12,789. DOL repeatedly justified its rule

---

[17] For every other visa program, DOL follows the SOC Classification Principles and Coding Guidelines. The second coding guideline is that when a worker could be coded in more than one occupation, they receive the occupation with the highest skill level. If there's no difference in skill levels, they receive the occupation in which they spend the most time. Bureau of Labor Statistics, "2018 SOC User Guide – Classification Principles and Coding Guidelines" 2, Nov. 2017, https://www.bls.gov/soc/2018/soc_2018_class_prin_cod_guide.pdf. In the Final Rule, DOL adopted the SOC occupation categories but discarded the SOC system's rules for assigning occupations, a deep incongruity. Also, the first SOC classification principle is that each occupation is assigned to only one category, so the premise for the overlapping duties rule is false, further adding to the confusion and the need for a valid cost estimate of the Final Rule. *Id.* at 1; JA79.

using this estimate.  DOL mentions the 2% or 98% estimate 14 times throughout the Final Rule.  *See, e.g.*, *id.* at 12,785.  The two percent estimate served as the basis for DOL's conclusion that the regulation was not "economically significant," allowing DOL to avoid stricter scrutiny under Executive Order 12,866.  *Id.* at 12,784-85.

Since DOL justified its rule based on the two percent or 98% estimate, one would expect the estimate to be well-founded, but it was not.  The estimate is based on this sentence, "Of the 25,150 certifications between FY 2020 and FY 2021 only 732 (2.91%) have wage impacts from the final rule."  *Id.* at 12,789 n106.  In prior years, only 2.91% of jobs were assigned to occupations outside of the six protected categories.  DOL improperly rounded 2.91% down to 2% for rhetorical effect.  But the deeper problem with relying only on historical data is that applications from prior years were not subject to the overlapping duties rule.  DOL failed to estimate how many workers would be affected by its new paradigm for assigning occupations.

Farmers took notice, and alerted DOL to its lapse:

> Several commenters asserted that the Department underestimates the impact of the revised AEWR structure because it does not consider classifications of workers to new (higher wage) SOC codes as a result of the requirement to pay the highest of applicable SOC code AEWRs.  One commenter asserted that all farm work overlaps and classifications should not be based on intermittent activities and others assert that workers should not receive higher wages if they only minimally perform the higher classification.

Final Rule, 88 Fed. Reg at 12,785.

DOL admitted that it failed to estimate the impact of the overlapping duties rule:

The Department understands that we may have underestimated the impact of the revised AEWR structure due to the final rule's new requirement to pay the highest of applicable SOC code AEWRs. However, the Department does not have any data readily available to estimate the number of workers that may have their SOC codes reclassified as a result of the final rule, and commenters did not provide such data in their comments on the NPRM.

*Id.* at 12,785 (emphasis added). DOL goes on to explain that, although it had data available, it did not want to do the work of analyzing it:

Commenters are correct that the specific incidences are case-specific and require detailed analysis to assign codes. To determine the number of potentially reclassified certifications would require review of each case in the certification dataset. As such, the number of workers who may have their SOC codes reclassified because of this final rule is not readily accessible to the Department.

*Id.* at 12,785 n95. In DOL's view, to estimate the impact of the rule it would have had to analyze every single case adjudicated in prior years. This is simply untrue. DOL could have prepared an estimate by analyzing a subset of cases. The Final Rule uses the word "estimate" or some variation of it 90 times, and yet when it came to judging the cost of its rule, DOL feigned ignorance of the concept of an estimate. Thus, when DOL says that it does not have any data "readily available," DOL actually means it had too much data. Because there was too much data, DOL refused to analyze any of it.

Farmers deserve to know how much this rule will cost them. DOL, however, cannot say. It cannot say because it did not look at the data it had. This data is accessible – something DOL has not contradicted during this litigation. Nor has DOL explained why, with a database of applications, DOL could not take a

statistically sufficient sample and make inferences. Rather, it just ignored the data at hand. This failure makes it impossible to balance policy choices. After all, one has to assign proper weight to the various factors before weighing their relative importance. DOL did not do this. Rather, DOL assumed no or minimal cost so that cost issues would not outweigh its preferred result of setting higher AEWRs. That is not reasoned decision-making; it is arbitrary and capricious decision-making in violation of the APA.

Economist Madeline Zavodny estimated that 10% of workers would be reclassified as truck drivers, suggesting that DOL's estimate (or non-estimate) was far off. Dr. Zavodny also explained that the data necessary to do this calculation is readily available to DOL. Ex. 2, Report of Madeline Zavodny at 12-14. The American Farm Bureau Federation estimated that at least 10% of workers would be impacted, and the percentage would be even higher due to the overlapping duties rule.[18] Experts may differ on the details of the estimate, but the problem is that DOL did not even try to estimate the cost of the central feature of its new rule, when even a little effort could have easily produced a result. With no sense of what the rule will cost, DOL cannot even begin to weigh the costs against the benefits and analyze how its new rule squares with Congress's goals.

Just as in *Azar*, the cost estimate used by the agency here was "pulled from thin air." *Mayor of Balt. v. Azar v. Azar*, 973 F.3d 258, 282 (4th Cir. 2020) (*en*

---

[18] American Farm Bureau Federation, Comments on Proposed Rulemaking, Docket No. ETA-2021-0006-0001, 2 (Feb. 2, 2022), https://downloads.regulations.gov/ETA-2021-0006-0086/attachment_1.pdf.

*banc*). No amount of deference to agency expertise can fix this. "Even according to the greatest respect to the Secretary's action, however, deference cannot fill the lack of an evidentiary foundation on which the Final Rules must rest." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986).

## CONCLUSION

The Court should vacate and set aside the Final Rule as to any H-2A job order submitted by or on behalf of Plaintiffs.


Dated: March 15, 2024

/s/ Mark Stevens
Mark Stevens, VA Bar # 86247
Clark Hill PLC
1001 Pennsylvania Ave. NW, Suite 1300 South
Washington, DC 20004
Telephone: (202) 552-2358
Facsimile: (202) 772-0919
mstevens@clarkhill.com

/s/ Wendel V. Hall
Wendel V. Hall
Hall Global
1350 Connecticut Ave, N.W., Suite 1220
Washington, DC 20036
Telephone: 202-744-3250
wendel@halllawoffice.net

*Counsel for Plaintiffs*

Patrick H. Flanagan, NC Bar # 17407
Cranfill Sumner LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
phf@cshlaw.com

## Index of Exhibits

1. Declaration of Manuel Fick with Exhibits
   a. Comment on Proposed Rule
   b. New AEWR Rule Impact Survey
   c. Second New AEWR Rule Impact Survey
2. Report of Madeline Zavodny, Ph.D
3. Affidavit of Russ Hoggard
4. Affidavit of Justin and Jennifer Bebb
5. Affidavit of Joel Lyman
6. Affidavit of Lynette (Bo) Young
7. Affidavit of John Petron
8. Affidavit of Frank Kasten III
9. Affidavit of Michael Bushman
10. Affidavit of Scott Schiff
11. Second Supplemental Declaration of Scott Schiff
12. Affidavit of David Masching
13. Affidavit of Emily Swift
14. Affidavit of Mark Deacon
15. Affidavit of Roger T. Haaland
16. Affidavit of Josh Wurmnest
17. Affidavit of Caitlin Heap
18. Affidavit of Mindy Gillespie
19. Affidavit of Travis Berthold
20. Affidavit of Trevor Jacobsen